WISCONSIN PROFESSIONAL POLICE ASSOCIATION, INC., John Charewicz, David Mahoney, Susan Armagost, Steven Urso and State Engineering Association, by its President, Thomas H. Miller, David Buschkopf, Ross Johnson, Melvin Sensenbrenner, Bernard Kranz and Thomas H. Miller, Petitioners,†

v.

George LIGHTBOURN, Secretary of the Wisconsin Department of Administration, Jack C. Voight, Wisconsin State Treasurer, Wisconsin Education Association Council, by its President Terry Craney and its Vice-President, Stan Johnson, and Donald Krahn, Margaret Guertler, Gerald Martin and Phyllis Pope, Respondents.

Supreme Court

*No. 99–3297–OA. Oral argument October 4, 2000.—Decided June 12, 2001.*

2001 WI 59

(Also reported in 627 N.W.2d 807.)

†Motion for reconsideration denied July 18, 2001.

513

514

517

519

520

For the petitioners, Wisconsin Professional Police Association, Inc., John Charewicz, David Mahoney, Susan Armagost and Steven Urso, there were briefs by *Lester A. Pines, Carol Grob, Linda Harfst* and *Cullen, Weston, Pines & Bach*, Madison, and oral argument by *Lester A. Pines*.

For the petitioners, State Engineering Association, Thomas H. Miller, David Buschkopf, Ross Johnson, Melvin Sensenbrenner, and Bernard Kranz, there were briefs by *Michael E. Banks* and *Haus, Resnick and Roman, LLP*, Madison, and oral argument by *William Haus*.

For the respondents, George Lightbourn, Secretary of the Wisconsin Department of Administration, and Jack C. Voight, Wisconsin State Treasurer, there was a brief by *Ann Ustad Smith* and *Michael Best & Friedrich, LLP*, Madison, and oral argument by *Ann Ustad Smith*.

For the respondents, Wisconsin Education Association Council, Terry Craney, Stan Johnson, Donald Krahn, Margaret Guertler, Gerald Martin and Phyllis Pope, there was a brief by *Lucy T. Brown, Anthony L. Sheehan, Michael J. Van Sistine* and *Wisconsin Education Association Council*, Madison, and oral argument by *Anthony L. Sheehan*.

An amicus curiae brief was filed by *Timothy E. Hawks* and *Shneidman, Myers, Dowling, Blumenfield, Ehlke, Hawks & Domer*, Milwaukee, on behalf of the Wisconsin Federation of Teachers, WFT, AFT, AFL-CIO.

An amicus curiae brief was filed by *Bruce F. Ehlke* and *Shneidman, Myers, Dowling, Blumenfield, Ehlke, Hawks & Domer*, Milwaukee, on behalf of the AFSCME District Council 40.

¶ 1. DAVID T. PROSSER, J. This is an original action under Article VII, Section 3(2) of the Wisconsin Constitution.[1]

¶ 2. The petitioners consist of two groups: (1) the Wisconsin Professional Police Association, Inc. (WPPA) and several of its individual members, and (2) the State Engineering Association (SEA), by its president, Thomas H. Miller, and several of SEA's individual members. The interests and claims of these petitioners are not identical, but all petitioners challenge the constitutionality of portions of 1999 Wisconsin Act 11 (Act 11) as amended by 1999 Wiscon-

_____

[1] "The supreme court has appellate jurisdiction over all courts and may hear original actions and proceedings. The supreme court may issue all writs necessary in aid of its jurisdiction." Wis. Const. art. VII, § 3(2).

sin Act 12.[2] Together, the two acts make numerous changes in the Wisconsin retirement system (WRS or the system).

¶ 3. The respondents are George Lightbourn, Secretary of the Wisconsin Department of Administration, and Jack C. Voight, Wisconsin State Treasurer, as well as the Wisconsin Education Association Council (WEAC) by its president, Terry Craney, and its vice-president, Stan Johnson, and four other individuals who are now or have been affiliated with WEAC. WEAC is the largest organization in Wisconsin representing teachers. Many of WEAC's members are participants in the WRS.

¶ 4. The supreme court limits its exercise of original jurisdiction to exceptional cases in which a judgment by the court significantly affects the community at large. We accepted original jurisdiction in this case because it meets that test. The challenges to Act 11 impact the pension interests of more than 460,000 "participants"[3] in the system, as well as the fiscal

---

[2] The subject of this litigation is 1999 Wisconsin Act 11. We note that 1999 Wisconsin Act 12 made minor corrections to 1999 Wisconsin Act 11. This opinion uses the terms "Act 11" or "the Act" to refer to the combination of 1999 Wisconsin Acts 11 and 12, unless noted otherwise. The changes found in Act 12 do not materially affect the issues in this case.

[3] Wisconsin Stat. § 40.02(45) (1997–98) defines "participant" as "any person included within the provisions of the Wisconsin retirement system by virtue of being or having been a participating employee whose account has not been closed under s. 40.25(1) or (2)."

All statutory references are to the 1997–98 volumes of the Wisconsin Statutes unless noted otherwise. In discussing the changes made to Chapter 40 of the statutes by 1999 Wis. Act 11, we cite the 1997–98 volumes in order to accurately describe

responsibilities of the State of Wisconsin and all government employers[4] within this state whose past or present employees are participants in the system. Historically, several of the major cases examining public employee pension issues have begun as original actions. *See State ex rel. Dudgeon v. Levitan*, 181 Wis. 326, 193 N.W. 499 (1923); *State ex rel. Thomson v. Giessel*, 262 Wis. 51, 53 N.W.2d 726 (1952) (*Giessel I*); *State ex rel. Thomson v. Giessel*, 265 Wis. 558, 61 N.W.2d 903 (1953) (*Giessel II*); *Columbia County v. Bd. Of Trustees of Wis. Ret. Fund*, 17 Wis. 2d 310, 116 N.W.2d 142 (1962). Moreover, Act 11 includes a nonstatutory provision requesting this court to "take

---

these changes. The 1999–2000 volumes of the statutes contain Chapter 40 as modified by Act 11.

Notwithstanding our use of the 1997–98 volumes of the statutes, we use the word "employee," as opposed to "employe," whenever we quote the statutes and in all other discussion throughout this opinion. 1999 Wis. Act 185, § 193 changed the spelling of the word "employe" to "employee" in the statutes and this change is reflected in the 1999–2000 volumes. Because the legislature has decided to use the "ee" spelling in the statutes, we have used the same spelling, even in the statutory quotations from the 1997–98 volumes and the quotations from Act 11. We have not, however, changed the spelling of "employe" in any quotations from cases.

[4] Wisconsin Stat. § 40.02(28) provides:

"Employer" means the state, including each state agency, any county, city, village, town, school district, other governmental unit or instrumentality of 2 or more units of government now existing or hereafter created within the state and any federated public library system established under s. 43.19 whose territory lies within a single county with a population of 500,000 or more, except as provided under ss. 40.51 (7) and 40.61 (3), or a local exposition district created under subch. II of ch. 229. Each employer shall be a separate legal jurisdiction for OASDHI purposes.

jurisdiction of any original action relating to the implementation of this act." 1999 Wis. Act 11, § 27(4t).

¶ 5. Petitioners present multiple challenges to components of Act 11. SEA also challenges the legality of the entire Act on procedural grounds. We have carefully examined each claim presented and conclude that none of the challenged portions of Act 11 is unconstitutional beyond a reasonable doubt. We also conclude that the Act was not approved in violation of Article IV, Section 26 of the Wisconsin Constitution. Consequently, the injunction issued by this court on December 29, 1999, is lifted so that Act 11 may be enforced.

## I. FACTUAL BACKGROUND

¶ 6. This case requires a thorough grasp of the Wisconsin retirement system. For its facts, the court relies on the lengthy Stipulation of Facts agreed to by the parties, under the supervision of Reserve Circuit Judge Michael J. Barron, and an invaluable 75-page analysis of the system by Tony Mason of the Legislative Fiscal Bureau. *See* Tony Mason, Wisconsin Legislative Fiscal Bureau, *Informational Paper No. 73, Wisconsin Retirement System* (1999) [hereinafter *Wisconsin Retirement System*]. Mason's analysis is listed as a stipulated exhibit by the parties. The court draws heavily upon these two documents, as well as Chapter 40, of the Wisconsin Statutes, for its discussion in this section.

¶ 7. The Wisconsin retirement system is the product of many years of legislative action on public employee retirement in Wisconsin. This state's first retirement plan for public employees was created for Milwaukee protective service employees (police and

fire) in 1891.[5] Many additional retirement plans followed, including a pension plan for Milwaukee teachers in 1909, and a statewide plan for teachers in 1911.[6] As a general rule, these early plans operated independent of each other, either as county or municipal retirement plans or as retirement plans covering certain types of employees, such as teachers and protective service employees.[7]

¶ 8. In 1945, the legislature began studying the possibility of consolidating various public employee retirement plans;[8] and in 1947, it consolidated many of the plans into a state system known as the Wisconsin Retirement Fund.[9] The legislature also created a 10-member Joint Survey Committee on Retirement Systems to monitor public pension plans and proposed statutory changes to the state-operated plans.[10]

¶ 9. Over the years, consolidation moved forward. In 1967, the legislature reorganized the executive branch of state government, and it created the Department of Employee Trust Funds (DETF) as well as a seven-member Employee Trust Funds Board

---

[5] *See* § 1, ch. 287, Laws of 1891, *cited in* Tony Mason, Wisconsin Legislative Fiscal Bureau, *Informational Paper No. 73 Wisconsin Retirement System* 1 (1999) [hereinafter *Wisconsin Retirement System*].

[6] *Wisconsin Retirement System*, *supra*, at 1 (citing ch. 510, Laws of 1909 and ch. 322, Laws of 1911).

[7] *Wisconsin Retirement System*, *supra*, at 1–3.

[8] *Wisconsin Retirement System*, *supra*, at 2; Stipulation of Facts at ¶ 6.

[9] *Wisconsin Retirement System*, *supra*, at 2–3 (citing ch. 206, Laws of 1947, which consolidated various statewide pension plans).

[10] *Wisconsin Retirement System*, *supra*, at 3 (citing ch. 376, Laws of 1947, which created the Joint Survey Committee on Retirement Systems).

(ETF Board or Board) to direct and supervise the new department.[11] One result of this legislation was to bring all non-Milwaukee pension plans under the administration of DETF.[12]

¶ 10. In 1975, efforts began to unite the Wisconsin Retirement Fund, the State Teachers Retirement System, and the Milwaukee Teachers Retirement Fund into a system to be known as the WRS.[13] By 1982, the legislature completed this merger and folded 90 percent of all public employees in Wisconsin into one pension system.[14] This legislation solidified the administration and management structure of the WRS under the ETF Board.[15]

¶ 11. For purposes of this litigation, the WRS consists of approximately 461,000 participants: roughly 255,000 active employees, 103,000 annuitants, and 103,000 "inactive participants" (former participating employees who have not yet become annuitants).[16]

¶ 12. There are four categories of active participating employees. The vast majority (about 234,000)

---

[11] *Wisconsin Retirement System, supra,* at 4 (describing ch. 75, Laws of 1967 as "another significant step towards retirement system consolidation").

[12] *Wisconsin Retirement System, supra,* at 4 (explaining the result of ch. 75, Laws of 1967).

[13] *Wisconsin Retirement System, supra,* at 4 (arguing "the most significant advancement of the post–1948 pension fund merger philosophy was embodied in ch. 280, Laws of 1975").

[14] *Wisconsin Retirement System, supra,* at 4 (citing ch. 96, Laws of 1981); Stipulation of Facts at ¶ 6.

[15] *Wisconsin Retirement System, supra,* at 4 (describing effect of ch. 96, Laws of 1981).

[16] Stipulation of Facts at ¶ 43. "An 'inactive participant' is a participant who is not an annuitant or a participating employee." Stipulation of Facts at ¶ 41.

are classified as general employees.[17] The other three categories are (1) elected officials and executive employees; (2) protective service employees *not* subject to Titles II and XVIII of the federal Social Security Act; and (3) protective service employees subject to the federal Social Security Act.

¶ 13. At the end of 1998, the WRS was supported by nearly 1,200 different employers, including the agencies of the State of Wisconsin.[18] The WRS is funded by contributions from employers and employees, and the interest earned on these contributions.[19]

A. Employee Contributions

¶ 14. Employee required contributions are determined on a statutorily-mandated percentage of an employee's income.[20] The four different categories of employees are required to contribute different percentages of their income to their retirement.[21] Employee required contributions range from 5 percent to 8 percent of employee income, depending upon an employee's statutory classification.[22] In recent years, the state and other public employers have "picked up" most employee required contributions as part of their

---

[17] Stipulation of Facts at ¶ 43.

[18] Stipulation of Facts at ¶ 36.

[19] Wis. Stat. § 40.05; *Wisconsin Retirement System, supra,* at 22; Stipulation of Facts at ¶ 15 (describing where the fixed retirement investment trust funding comes from).

[20] Wis. Stat. § 40.05(1); *Wisconsin Retirement System, supra,* at 34.

[21] Wis. Stat. § 40.05(1); *Wisconsin Retirement System, supra,* at 34; Stipulation of Facts at ¶ 49.

[22] Wis. Stat. § 40.05(1)(a); *Wisconsin Retirement System, supra,* at 35 (Table 22), 44 (Table 27).

overall compensation of employees.[23] This practice is permitted by Wis. Stat. § 40.05(1)(b).[24] State and local employers "pick up" about 99 percent of employee required contributions.[25] With certain limitations, employees may enhance their pensions by contributing more than the statutorily-required amount.[26] This supplementary payment is a voluntary contribution.

¶ 15. A different kind of employee required contribution is known as a "benefit adjustment contribution."[27] The benefit adjustment contribution resulted from the increased retirement benefits approved by the legislature in 1983 Wis. Act 141.[28] Wisconsin Stat. § 40.05(2m) sets the benefit adjustment contribution at 1 percent of employee earnings.[29] Many employers have chosen to pick up this contribution for their employees; and for accounting purposes, the "benefit adjustment contribution" is treated as an

[23] Wis. Stat. § 40.05(1)(b); *Wisconsin Retirement System, supra*, at 37–38, 43 (Table 26).

[24] *Wisconsin Retirement System, supra*, at 37.

[25] *Wisconsin Retirement System, supra*, at 43 (Table 26). The participants in the WRS are all public employees. Some work for the State of Wisconsin (state) and others work for public employers such as counties, cities, towns, villages, school districts, and library districts. Wis. Stat. §§ 40.02(27) and 40.21. Throughout this opinion, we frequently refer to the state alone when we discuss employers. In so doing, we mean to include other public employers.

[26] Wis. Stat. § 40.32.

[27] Wis. Stat. § 40.05(2m); *Wisconsin Retirement System, supra*, at 36–37; Stipulation of Facts at ¶ 26.

[28] *Wisconsin Retirement System, supra*, at 46 (citing 1983 Wis. Act 141).

[29] Wis. Stat. § 40.05(2m); *Wisconsin Retirement System, supra*, at 36.

employer contribution.[30] Wisconsin Stat. § 40.05(2n) permits the ETF Board to adjust annually the required benefit adjustment contribution rates, if so advised by the actuary.[31] For example, even though Wis. Stat. § 40.05(1)(a) sets employee contribution rates at a range of 5 to 8 percent, adjustments in the rates by the ETF Board meant that the rates ranged from 4.3 to 5.8 percent in 1999.[32]

## B. Employer Contributions

¶ 16. Employer contributions are calculated in a different manner from employee required contributions. Employer contribution rates, expressed as a percentage of payroll, are not set in the statutes but are determined annually as part of an actuarial evaluation of the WRS.[33] Each year the WRS consulting actuary evaluates the funding requirements for the system to meet the costs of estimated future retirement benefits, utilizing the actuarial assumptions determined in the consulting actuary's tri-annual review.[34] This valuation process is typically conducted during the late spring of each year.[35] The annual contribution rate developed for employers is the amount sufficient to fund these normal costs "net of all revenues received

---

[30] Wis. Stat. § 40.05(2m); *Wisconsin Retirement System, supra,* at 36.

[31] Wis. Stat. § 40.05(2n); *Wisconsin Retirement System, supra,* at 36–37; Stipulation of Facts at ¶ 26.

[32] Stipulation of Facts at ¶ 49.

[33] Wis. Stat. § 40.05(2); *Wisconsin Retirement System, supra,* at 38; Stipulation of Facts at ¶ 28.

[34] *Wisconsin Retirement System, supra,* at 38; Stipulation of Facts at ¶ 28.

[35] *Wisconsin Retirement System, supra,* at 38; Stipulation of Facts at ¶ 28.

from the statutory employee-required contributions, the benefit adjustment contributions and those investment earnings credited as current income."[36] The employer contribution rates developed by the actuary are presented to the ETF Board for formal approval and become effective on the next January 1.[37]

¶ 17. One of the actuarial assumptions used to determine employer contributions is the "assumed rate," defined in Wis. Stat. § 40.02(7) as "the probable average effective rate expected to be earned for the fixed annuity division on a long-term basis."[38] In recent years, § 40.02(7) set the assumed rate at 7.5 percent (subject to modification by the ETF Board as provided in that statute).[39] However, in 1992, the ETF Board, upon recommendation of the actuary, changed the assumed rate to 8 percent, and it used that assumed rate for purposes of determining contribution rates for calendar years 1993 through 2000.[40]

¶ 18. Another of the actuarial assumptions used to value the employer contributions is an assumption for across-the-board salary increases.[41] For years § 40.02(7) set the actuarial assumption for across-the-board salary increases at 1.9 percent *less* than the assumed rate (subject to modification by the ETF Board as provided in that statute).[42] However, the assumption for across-the-board salary increases was

---

[36] *Wisconsin Retirement System, supra,* at 38; Stipulation of Facts at ¶ 28.

[37] *Wisconsin Retirement System, supra,* at 38; Stipulation of Facts at ¶ 28.

[38] Stipulation of Facts at ¶ 29.

[39] Stipulation of Facts at ¶ 29.

[40] Stipulation of Facts at ¶ 29.

[41] Stipulation of Facts at ¶ 30.

[42] Stipulation of Facts at ¶ 30.

changed by the ETF Board, upon the recommendation of the actuary, several times.[43] The actuary's three-year investigation dated 1988, recommended (and the Board approved) changing the salary increase assumption from 6.0 percent to 5.6 percent.[44] The actuary's three-year investigation dated 1994 recommended (and the Board approved) changing the salary increase assumption from 5.6 percent to 5.3 percent. The actuary's three-year investigation dated 1997 recommended (and the Board approved) changing the salary increase assumption from 5.3 percent to 4.8 percent.[45]

¶ 19. In addition to the employer required contributions for current service, employers are required to pay contributions for any unfunded prior service liability (unfunded liability) that is owed to the WRS.[46] An employer's unfunded liability is the result of two factors: (1) a grant of credit under the WRS for services rendered by an employee before the employer joined the WRS; and (2) an increase in benefits for an employee's prior service that is not wholly funded by money already in hand.[47] The second situation is now more common. When the legislature authorizes increased benefits for WRS participants and retroactively applies the benefit increase to prior service, it may force employers to make unexpected additional contributions to the employer reserve to fund the retro-

---

[43] Stipulation of Facts at ¶ 30.

[44] Stipulation of Facts at ¶ 30.

[45] Stipulation of Facts at ¶ 30.

[46] Wis. Stat. § 40.05(2)(b); Stipulation of Facts at ¶ 31 (citing Wis. Stat. § 40.05(2)(b)); *Wisconsin Retirement System, supra,* at 39.

[47] Stipulation of Facts at ¶ 31; *Wisconsin Retirement System, supra,* at 39.

active benefit increase.[48] Once a retroactive benefit increase is approved by the legislature, employers usually have to "make up" for not having made contributions in the past to fund that benefit increase.

¶ 20. Employer contribution rates for the payment of unfunded liability are currently amortized over 40 years.[49] Permitting employers to spread contributions for unfunded liability over many years has enabled employers to finance retroactive benefits and service credit. "For most WRS employers, [payments began in 1986 and] payments to retire the unfunded accrued liabilities arising from previous benefit improvements will continue until 2026."[50]

C. WRS Trusts

¶ 21. The WRS includes two distinct trusts: a variable retirement investment trust (variable trust) and a fixed retirement investment trust (fixed trust or FRIT).[51] For purposes of this litigation, the variable trust contains approximately $7 billion[52] and the fixed trust contains about $48.7 billion.[53] The variable trust,

---

[48] *Wisconsin Retirement System, supra*, at 39.

[49] Wis. Stat. § 40.05(2)(b); Stipulation of Facts at ¶ 32 (citing Wis. Stat. § 40.05(2)(b)); *Wisconsin Retirement System, supra*, at 39.

[50] *Wisconsin Retirement System, supra*, at 39.

[51] Wis. Stat. § 40.04(3); *Wisconsin Retirement System, supra*, at 24–26; Stipulation of Facts at ¶ 12.

[52] *Wisconsin Retirement System, supra*, at 26.

[53] Stipulation of Facts at ¶ 15. The $48.7 billion figure does not necessarily reflect actual cash holdings of the fixed trust. Stipulation of Facts at ¶ 12 n.2. Rather, accounting measures factor into the balance of the trust. Stipulation of Facts at ¶ 12 n.2. In addition, the manner in which certain types of investment holdings of the fixed trust are valued, such as real estate,

which is not directly at issue in this case, is invested almost exclusively in common and preferred stock.[54] By contrast, the fixed trust contains a more diversified portfolio of investments than the variable trust.[55]The diversification of the fixed trust decreases a partici-

---

affect the balance of the trust. *Wisconsin Retirement System, supra*, at 28–29.

Further, the fixed trust does not necessarily hold $48.7 billion now. However, for purposes of this litigation, the parties have agreed that the fixed trust contained that amount at the end of 1998 and we will use end-of–1998 figures throughout this opinion unless otherwise explicitly stated. Stipulation of Facts at ¶ 15 (indicating total balance as of the last day of 1998). The 1998 figures were the most comprehensive available when the parties submitted briefs in this case. The precise account balances are not necessary to decide the constitutionality of Act 11.

[54] *Wisconsin Retirement System, supra*, at 26. The variable trust permits participation only for employees who elected to participate in the variable trust prior to April 30, 1980. Wis. Stat. § 40.04(7)(a). Section 319g, ch. 221, Laws of 1979 precluded any additional elections to participate in the variable trust after April 30, 1980. Thus, the number of employees participating in the variable trust is limited and is dwindling as employees leave public employment.

An employee who elected to participate in the variable trust before April 30, 1980, currently can place up to 50 percent of the employee and employer contributions in the variable trust. Wis. Stat. § 40.04(7)(a). Any employee contributions not made to the variable trust are credited to the employee's account in the fixed trust. Wis. Stat. § 40.04(7). Employees also have the right to terminate their participation in the variable trust. Wis. Stat. § 40.04(7)(a).

Act 11 will once again allow employees to elect to participate in the variable trust. 1999 Wis. Act 11, § 14. The petitioners have not challenged this portion of Act 11.

[55] *Wisconsin Retirement System, supra*, at 25 (Table 14). The fixed trust funds include investments in common and pre-

pant's potential to earn a large investment profit, but also decreases a participant's potential investment loss.[56]

¶ 22. There are 12 different accounts and reserves within the fixed retirement investment trust.[57] The 12 accounts are as follows: (1) Wis. Stat. § 40.65 duty disability reserve, (2) income continuation insurance reserve, (3) long term disability insurance reserve, (4) accumulated sick leave conversion credits, (5) Milwaukee death benefit account, (6) Milwaukee retirement systems account, (7) Wis. Stat. § 62.13 police and fire account, (8) WRS employer accumulation reserve, (9) WRS employee accumulation reserve, (10) WRS annuity reserve, (11) WRS undistributed earnings account, and (12) transaction amortization account.[58] Only two of the accounts, the Milwaukee retirement systems account and the WRS undistributed earnings account, are not affected by Act 11.[59]

¶ 23. The four accounts or reserves most pertinent to this case are the WRS employer accumulation reserve, the WRS employee accumulation reserve, the WRS annuity reserve, and the transaction amortization account (TAA).[60]

---

ferred stocks, public bonds, private placement securities, short-term cash holdings, and real estate. *Id.*

[56] *Wisconsin Retirement System, supra,* at 25–26.

[57] Stipulation of Facts at ¶ 12; *Wisconsin Retirement System, supra,* at 25.

[58] Wis. Stat. § 40.04(5); Stipulation of Facts at ¶ 12.

[59] Stipulation of Facts at ¶ 13.

[60] Stipulation of Facts at ¶ 14; Wis. Stat. § 40.04(3) (outlining statutory structure for accounts and reserves of the public employee trust fund).

## D. Employer Accumulation Reserve

¶ 24. The employer accumulation reserve holds employer required contributions plus benefit adjustment contributions, whether paid by employees or employers, and such other amounts as provided in Wis. Stat. § 40.04(5).[61] For purposes of this litigation, this account holds about $11.5 billion.[62] The funds in the employer reserve are held in one merged account.[63] In effect, the funds are pooled.[64] At the same time, the funds in this account are invested in both the fixed and variable trusts, depending upon the extent of employee choices to invest employer contributions in each trust respectively.[65]

¶ 25. Unfunded accrued liabilities operate as a debt for employers.[66] For accounting purposes, they are listed as an asset—that is, as a receivable—of the system.[67]

---

[61] Stipulation of Facts at ¶ 14; Wis. Stat. § 40.04(5).

[62] Stipulation of Facts at ¶ 12.

[63] Wis. Stat. § 40.04(5); *Wisconsin Retirement System, supra,* at 23; Stipulation of Facts at ¶ 17.

[64] Wis. Stat. § 40.04(5); *Wisconsin Retirement System, supra,* at 23; Stipulation of Facts at ¶ 17.

[65] *Wisconsin Retirement System, supra,* at 23; Wis. Stat. § 40.04(7).

[66] Wis. Stat. § 40.05(2)(b); Stipulation of Facts at ¶¶ 31–32 (citing Wis. Stat. § 40.05(2)(b)) and describing unfunded liabilities as "owed to the WRS" and a "debt"); *Wisconsin Retirement System, supra,* at 39.

[67] Wisconsin Department of Employee Trust Funds, *Comprehensive Annual Financial Report* 24 (1998).

## E. Employee Accumulation Reserve

¶ 26. The employee accumulation reserve holds the funds contributed by or on behalf of employees.[68] For purposes of this litigation, the account balance of the employee reserve is just short of $10 billion.[69] Unlike the employer reserve, the employee reserve contains individual accounts for each active and inactive employee.[70] All employee contributions, including the percentage of earnings mandated by statute and any additional voluntary contributions, are credited to each employee's individual account.[71] Even if an employer picks up contributions on behalf of the employee, the contributions are credited to the employee's individual account.[72] The funds in the employee reserve are invested in both the fixed and variable trusts, depending upon whether an employee has chosen to invest a portion of the contributions for him or her in the variable trust.[73]

## F. Annuity Reserve

¶ 27. The third pertinent account is the annuity reserve.[74] For purposes of this litigation, the annuity

---

[68] Wis. Stat. § 40.04(4)(a); Stipulation of Facts at ¶ 14; *Wisconsin Retirement System, supra*, at 23.

[69] Stipulation of Facts at ¶ 12.

[70] Wis. Stat. § 40.04(4)(a); *Wisconsin Retirement System, supra*, at 23; Stipulation of Facts at ¶ 16.

[71] Wis. Stat. § 40.04(4)(a); *Wisconsin Retirement System, supra*, at 23.

[72] Wis. Stat. § 40.04(4)(a); *Wisconsin Retirement System, supra*, at 37; Stipulation of Facts at ¶ 14.

[73] *Wisconsin Retirement System, supra*, at 23; Wis. Stat. § 40.04(4)(a)2. and (7).

[74] Wis. Stat. § 40.04(6); Stipulation of Facts at ¶ 14.

reserve has a balance of $14.8 billion.[75] The annuity reserve holds funds for employees who choose to accept an annuity instead of a lump-sum payment upon leaving public service.[76] Most long-term employees choose some form of annuity when leaving public employment.[77]

¶ 28. Long-term employees typically choose from a variety of annuity options when leaving public employment. There are three types of annuities: straight life annuity, life annuity with guarantee period, and joint survivorship annuity.[78] In addition, two permissible calculation methods lead to two different benefit options, a money purchase plan or a formula benefit plan.[79]

¶ 29. The formula benefit plan provides an annuity for a retiring employee based on a percentage of the employee's final average earnings.[80] A statutory formula determines an employee's initial annuity.[81] Different classes of public employees are eligible for different percentage calculations in determining annu-

---

[75] Stipulation of Facts at ¶ 12.

[76] *Wisconsin Retirement System, supra*, at 24; Stipulation of Facts at ¶ 14.

[77] *Wisconsin Retirement System, supra*, at 46. Some employees choose a separation benefit when they leave public employ. This benefit is not an annuity and is not typical for long-term employees. *Wisconsin Retirement System, supra*, at 46.

[78] Wis. Stat. § 40.24(1); *Wisconsin Retirement System, supra*, at 56–57.

[79] Wis. Stat. § 40.24; *Wisconsin Retirement System, supra*, at 48.

[80] *See* Wis. Stat. § 40.24; *Wisconsin Retirement System, supra*, at 48–51; *see also* Wis. Stat. § 40.02(33) (defining final average earnings).

[81] Wis. Stat. § 40.23(2), (2m).

ities.[82] The WRS has been described as a defined benefit plan to the extent that its participants are eligible to receive a specific retirement benefit calculated to the following formula: (creditable service) x (final average earnings) x (formula multiplier) x (actuarial adjustment for retirement prior to the normal retirement date).[83]

¶ 30. The elements of this formula are defined in Chapter 40 of the statutes: "creditable service" is defined in Wis. Stat. § 40.02(17); "final average earnings" is defined in Wis. Stat. § 40.02(33); "normal retirement date" is defined in Wis. Stat. § 40.02(42); the formula multipliers are set out in Wis. Stat. §§ 40.23(2)(b)1–4 and 40.23(2m)(e)1–4.[84] Actuarial reductions for early retirement are described in Wis. Stat. §§ 40.23(2)(d) and 40.23(2m)(f).[85]

¶ 31. The money purchase plan can offer a departing employee a better annuity if accumulated funds can purchase a larger annuity, based on actuarial tables, than a formula benefit.[86]

¶ 32. When an employee leaves public service, a variety of monies are transferred to the annuity

[82] Wis. Stat. § 40.23(2), (2m); Stipulation of Facts at ¶ 46.

[83] Stipulation of Facts at ¶ 8; *see also* Wis. Stat. § 40.23(2) and (2m). "The WRS is a hybrid plan with characteristics of both a defined benefit plan and a defined contribution plan." Stipulation of Facts at ¶ 7. Defined benefit plans are discussed in *Association of State Prosecutors v. Milwaukee County*, 199 Wis. 2d 549, 558–59, 544 N.W.2d 888 (1996). In *Wisconsin Retired Teachers Ass'n v. Employe Trust Funds Board*, 207 Wis. 2d 1, 12, 558 N.W.2d 83 (1997), the court noted that an employee's base annuity, the formula benefit, "is guaranteed by the State."

[84] Stipulation of Facts at ¶ 8.

[85] Stipulation of Facts at ¶ 9.

[86] *See* Wis. Stat. § 40.23(3); *Wisconsin Retirement System, supra*, at 53.

reserve to finance the employee's annuity.[87] The entire balance of the employee's account in the employee reserve is transferred to the annuity reserve.[88] In addition, an amount is credited to the annuity reserve to account for any variable trust participation by the employee, including any employer required contributions arising from variable trust participation by the employee.[89] Finally, an amount is transferred from the employer reserve to the annuity reserve "that when increased by an interest income assumption of 5% annually will fully finance the [employee's] future benefit payments."[90] Even after the funds are sent to the annuity reserve, the monies continue to be invested in the fixed trust[91] or in the variable trust in the same proportion as prior to the employee leaving public service.[92]

## G. Transaction Amortization Account

¶ 33. The final pertinent account is the transaction amortization account, or TAA.[93] For purposes of this litigation, the TAA holds approximately $11.5 billion.[94] The TAA functions more as an accounting

---

[87] *Wisconsin Retirement System, supra*, at 24; Stipulation of Facts at ¶ 14.

[88] *Wisconsin Retirement System, supra*, at 24; Stipulation of Facts at ¶ 14.

[89] *Wisconsin Retirement System, supra*, at 26; Stipulation of Facts at ¶ 14.

[90] *Wisconsin Retirement System, supra*, at 24.

[91] *Wisconsin Retirement System, supra*, at 24; Wis. Stat. § 40.04(3) and (7).

[92] *Wisconsin Retirement System, supra*, at 24; Wis. Stat. § 40.04(3) and (7).

[93] Wis. Stat. § 40.04(3). Stipulation of Facts at ¶ 14.

[94] Stipulation of Facts at ¶ 12.

mechanism than as a receptacle for funds, such as the employer or employee reserves.[95] All gains and losses of the fixed trust are credited to the TAA, including both realized and unrealized gains and losses.[96] "The purpose of the TAA is to smooth the impact of investment gains or losses on the accounts and reserves of the Fixed Trust."[97] Spreading the impact of gains and losses over a period of years, as opposed to absorbing actual investment experiences immediately, tends to create greater predictability for determining the contributions necessary to fund the WRS.[98]

¶ 34. On December 31st of each year, 20 percent of the TAA balance is distributed to the fixed trust.[99] This distribution from the TAA is divided proportionately among all the accounts in the fixed trust, including the employee, employer, and the annuity reserves.[100] It enables the other accounts in the fixed trust to receive the investment income gained by the fixed trust.[101] Prior to 1989, only 7 percent of the TAA was distributed each year.[102] However, 1989 Wis. Act

[95] Stipulation of Facts at ¶ 20; *Wisconsin Retirement System, supra,* at 28 (noting accounting effects of TAA).

[96] Wis. Stat. § 40.04(3)(a); *Wisconsin Retirement System, supra,* at 28; Stipulation of Facts at ¶ 20.

[97] *Wisconsin Retirement System, supra,* at 28.

[98] *Wisconsin Retirement System, supra,* at 28.

[99] Wis. Stat. § 40.04(3)(a); *Wisconsin Retirement System, supra,* at 28; Stipulation of Facts at ¶ 21.

[100] Wis. Stat. § 40.04(3)(a); *Wisconsin Retirement System, supra,* at 28; Stipulation of Facts at ¶ 20.

[101] Wis. Stat. § 40.04(3)(a); *Wisconsin Retirement System, supra,* at 28; Stipulation of Facts at ¶ 20.

[102] Wis. Stat. § 40.04(3)(a) (1987–88); *Wisconsin Retirement System, supra,* at 28; Stipulation of Facts at ¶ 21.

13 changed the distribution to 20 percent at year's close.[103]

¶ 35. Twice in the past, the legislature approved legislation providing for special one-time distributions from the TAA, apart from the annual statutory distributions. In 1987, the legislature passed 1987 Wis. Act 27, in which $230 million was distributed from the TAA to the various accounts in the trust.[104] Part of the $230 million was distributed to the annuity reserve to fund a special investment performance dividend (SIPD) for a specific group of annuitants.[105] Various employee associations successfully challenged the constitutionality of 1987 Wis. Act 27, §§ 436m, 684r, and 688km in *Wisconsin Retired Teachers Ass'n v. Employe Trust Funds Board*, 207 Wis. 2d 1, 8, 558 N.W.2d 83 (1997). The *Retired Teachers* court did not decide that case, however, on the propriety of the distribution from the TAA.[106] Thus, about $74.2 million was distributed to the employee reserve, $77.2 million to the employer reserve, and $78.5 million to the annuity reserve, according to the petitioner's brief in *Retired Teachers*.

¶ 36. Two years later, the legislature passed 1989 Wis. Act 13, in which $500 million was distributed from the TAA.[107] This legislation did not face a

[103] Stipulation of Facts at ¶ 21.

[104] 1987 Wis. Act 27; *Wisconsin Retirement System, supra,* at 29; Stipulation of Facts at ¶ 22.

[105] 1987 Wis. Act 27; *Retired Teachers,* 207 Wis. 2d at 8; *Wisconsin Retirement System, supra,* at 29; Stipulation of Facts at ¶ 22.

[106] *Retired Teachers,* 207 Wis. 2d at 8; Stipulation of Facts at ¶ 22.

[107] 1989 Wis. Act 13; *Wisconsin Retirement System, supra,* at 29; Stipulation of Facts at ¶ 22.

legal challenge.[108] The 1989 legislation also distributed money to the employee, employer, and annuity reserves.[109] Like the 1987 and 1989 Acts, Act 11 orders a lump sum distribution from the TAA to the accounts and reserves in the fixed trust.

## II. ACT 11

¶ 37. This section discusses the history and substance of Act 11.

¶ 38. Assembly Bill 495 was introduced on October 1, 1999, and referred to the Joint Survey Committee on Retirement Systems. Assembly Bulletin, *Assembly Bill 495*, at 169 (Dec. 31, 2000). On October 4, 1999, the committee held a public hearing on the bill and then took executive action. *Id.* The Assembly Speaker referred the bill to the Assembly Calendar of October 6, 1999, and Assembly Bill 495 was taken up, voted upon, and passed that day. *Id.* The bill was immediately messaged to the Senate, referred to and then withdrawn from the Committee on Senate Organization, and voted upon by the Senate on October 6, 1999. *Id.* On December 16, 1999, the Governor signed the bill into law as 1999 Wisconsin Act 11. *Id.* Early drafts of pension enhancement bills were under review from the beginning of the legislative session.[110]

¶ 39. Assembly Bill 495 is described in its relating clause as an Act "relating to: benefit improvements, interest crediting, variable annuity option, contribution credits for employers, death benefits, credit for legislative service, recognition of income and capital gains and losses in the fixed retirement investment

---

[108] Stipulation of Facts at ¶ 22.

[109] 1989 Wis. Act 13, § 47(2).

[110] Legislative Reference Bureau Drafting File for 1999 Wis. Act 11, Legislative History for 1999 Assembly Bill 495.

trust and affecting certain actuarial assumptions and liabilities under the Wisconsin retirement system." Several of these changes require discussion.

## A. Benefit Improvements

¶ 40. The formula multiplier or percentage multiplier described in ¶¶ 29–30 varies according to employee classification.[111] For a *protective occupation* participant covered by social security, an elected official, and an executive participating employee, the formula multiplier is 2 percent.[112] For a protective occupation participant not covered by social security, the formula multiplier is 2.5 percent.[113] For all other participants in the WRS, the formula multiplier is 1.6 percent.[114]

¶ 41. Act 11 increases the formula multipliers for all classes of participating employees in the WRS for creditable service performed *before* January 1, 2000 as follows:[115]

1) Protective occupation participants not covered by social security, from 2.5 percent to 2.665 percent.[116]

2) Protective occupation participants covered by social security, from 2 percent to 2.165 percent.[117]

---

[111] Stipulation of Facts at ¶ 10; Wis. Stat. § 40.23(2)(b)1–4 and (2m)(e)1–4.

[112] Wis. Stat. § 40.23(2m)(e)2–3.

[113] Wis. Stat. § 40.23(2m)(e)4.

[114] Wis. Stat. § 40.23(2m)(e)1.

[115] Act 11 affects the formula multiplier only for "participants who are participating employees after March 9, 1984." Wis. Stat. § 40.23(2m).

[116] 1999 Wis. Act 11, § 20 (amending Wis. Stat. § 40.23(2m)(e)4).

[117] 1999 Wis. Act 11, § 19 (amending Wis. Stat. § 40.23(2m)(e)3).

3) Elected officials and executive participating employees, from 2 percent to 2.165 percent.[118]

4) Other participants, from 1.6 percent to 1.765 percent.[119] The Act provides that creditable service performed *after* January 1, 2000 shall be calculated according to the prior multipliers.[120]

¶ 42. The Act also applies the increased multiplier for past service only to "individuals who are participating employees in the Wisconsin retirement system on January 1, 2000."[121]

¶ 43. Act 11 also raises the benefit cap, namely, the maximum amount of initial retirement annuity guaranteed by the state, for most employees.[122] Under the law in place before Act 11, the maximum amount of an initial annuity for a participant in the WRS was 65 percent of the participant's final average earnings.[123] The one exception to this rule was for a protective occupation participant not covered by social security whose initial annuity was capped at 85 percent of the participant's final average earnings.[124] Act 11 raises to 70 percent the cap for all participating employees who are capped at 65 percent, except for protectives covered by social security, whose initial annuities will continue to be capped at 65 percent.[125] It also maintains the 85 percent cap for protectives not covered by social secur-

---

[118] 1999 Wis. Act 11, § 18 (amending Wis. Stat. § 40.23(2m)(e)2).

[119] 1999 Wis. Act 11, § 17 (amending Wis. Stat. § 40.23(2m)(e)1).

[120] 1999 Wis. Act 11, §§ 17–20.

[121] 1999 Wis. Act 11, § 28(2).

[122] 1999 Wis. Act 11, § 16.

[123] Wis. Stat. § 40.23(2m)(b).

[124] Wis. Stat. § 40.23(2m)(b).

[125] 1999 Wis. Act 11, § 16.

ity.[126] For these protectives, the maximum initial annuity cap will stay at 85 percent of final average earnings.

¶ 44. The benefit cap hike applies only to active participating employees in the Wisconsin retirement system on January 1, 2000.[127] Thus, by the terms of the Act, the 103,000 "inactive participants" in the WRS—that is, the former participating employees who have not yet become annuitants—are not eligible for either the increase in the multiplier for creditable service "performed before January 1, 2000" or the benefit cap increase made available for two categories of employees. Active participating employees who begin work after January 1, 2000, are ineligible for the increase in the multiplier.

B. Accelerated Distribution of Money from the TAA

¶ 45. Two of the components of the public employee trust fund are the variable retirement investment trust and the fixed retirement investment trust.[128] As noted above, the transaction amortization account is one of the 12 accounts and reserves within the fixed trust. The TAA is maintained and used to smooth out fluctuations in unrecognized gains and losses in the value of fixed trust assets.[129] "The balance of the TAA closely parallels the difference between market value and the adjusted book value of the assets."[130] Each year, 20 percent of the balance of the

[126] 1999 Wis. Act 11, § 16.

[127] 1999 Wis. Act 11, § 28(2).

[128] Wis. Stat. § 40.04(3); Stipulation of Facts at ¶ 12.

[129] *Wisconsin Retirement System, supra,* at 28; Stipulation of Facts at ¶¶ 19–20.

[130] Legislative Reference Bureau Drafting File for 1999 Wis. Act 11, Legislative History for 1999 Assembly Bill 495.

TAA is distributed to participating accounts in the fixed trust.[131]

¶ 46. Act 11 provides that on December 31, 1999, $4 billion is to be distributed from the TAA to the reserves and accounts in the fixed trust in amounts equal to the percentage of the total distribution determined by dividing each reserve's and account's balance on January 1, 1999, by the total balance of the fixed trust on January 1, 1999.[132] Most of the $4 billion distribution is to be sent arithmetically into the employee, employer, and annuity reserves.[133]

¶ 47. A portion of the $4 billion distribution will fund the benefit improvements created by Act 11. Hence, the $4 billion distribution helps both employers and participating employees. Money distributed to the employee reserve will enhance the individual accounts of some of the inactive participants in the reserve. Money distributed to the annuity reserve will produce a substantial increase in annual annuity payments.

C. $200 Million Credit

¶ 48. Act 11 also provides that $200 million of the increase in the employer reserve resulting from the $4 billion distribution will be used to establish employer contribution credits to help satisfy required payments that employers have for unfunded liabilities.[134] These credits have the effect of reducing employer debt for

[131] Wis. Stat. § 40.04(3)(a); Stipulation of Facts at ¶ 21.

[132] 1999 Wis. Act 11, § 27(1)(a).

[133] These three reserves constitute the vast majority of the fixed trust balance and therefore the pro rata distribution language in § 27(1)(a) of Act 11 will cause most of the $4 billion to enter these three accounts. Stipulation of Facts at ¶ 12.

[134] 1999 Wis. Act 11, § 27(1)(b)1; Stipulation of Facts at ¶ 57.

unfunded liabilities, thereby permitting a suspension of payments for unfunded liability.[135] Employers who have already paid off their unfunded liability or who have credits in excess of such unfunded liability can suspend payment of the employer required contributions until their respective credits are exhausted.[136] All employers who are part of the WRS will benefit from the contribution credits.[137] After an employer's credits have been exhausted, the employer is required to resume payments to satisfy required contributions and any remaining unfunded liability.[138]

## D. Actuarial Assumptions

¶ 49. As noted above, employer required contribution rates, expressed as a percentage of payroll, are determined as part of each annual actuarial evaluation of the WRS. One of the actuarial assumptions considered is the "assumed rate," defined in Wis. Stat. § 40.02(7).[139] The statutory assumed rate was initially set at 7.5 percent, although, as authorized, the ETF Board changed the assumed rate to 8 percent in

---

[135] 1999 Wis. Act 11, § 27(1)(b)1; Stipulation of Facts at ¶ 57.

[136] 1999 Wis. Act 11, § 27(1)(b)1; Stipulation of Facts at ¶ 57. The estimated suspension period for payments ranges from 19.6 months on average for school districts to 58.2 months on average for special districts. The estimated payment suspension period for the State is 22.1 months.

[137] 1999 Wis. Act 11, § 27(1)(b)1; Stipulation of Facts at ¶ 57.

[138] 1999 Wis. Act 11, § 27(1)(b)1; Stipulation of Facts at ¶ 57.

[139] Stipulation of Facts at ¶ 29.

1992.[140] Act 11 amends § 40.02(7) so that the new statutory assumed rate is 8 percent.[141] Another actuarial assumption is the assumption for across-the-board salary increases.[142] This assumption, also set out in § 40.02(7), has been statutorily set at 1.9 percent less than the assumed rate.[143] However, as authorized, the ETF Board has revised the across-the-board salary assumption several times, moving it to 4.8 percent in 1998.[144] Act 11 amends the 1.9 percent in § 40.02(7) to 3.4 percent.[145] This produces a statutory assumption for across-the-board salary increases of 4.6 percent (8 percent less 3.4 percent).[146]

¶ 50. Both of these actuarial changes may affect employer and employee required contributions.[147] Nonetheless, the ETF Board retains the authority in Wis. Stat. § 40.02(7) to change the rates "due to changed economic circumstances" when the actuary so recommends. Moreover, Act 11 provides, in a non-statutory provision (Section 27(3)) that: "Notwithstanding any provision in this act, the employee trust funds board shall retain the authority to maintain proper actuarial funding of the Wisconsin retirement system."

¶ 51. For purposes of this litigation, the present unfunded liability for all employers totals approximately $2.2 billion.[148] In the past, the unfunded

---

[140] Stipulation of Facts at ¶ 29; *see also Wisconsin Retirement System, supra,* at 32.

[141] 1999 Wis. Act 11, § 5.

[142] Stipulation of Facts at ¶ 30.

[143] Wis. Stat. § 40.02(7); Stipulation of Facts at ¶ 30.

[144] Stipulation of Facts at ¶ 30.

[145] 1999 Wis. Act 11, § 5.

[146] 1999 Wis. Act 11, § 5.

[147] *Wisconsin Retirement System, supra,* at 38–43.

[148] Stipulation of Facts at ¶ 32.

liability of employers has been recalculated following adjustments to the actuarial assumptions that govern overall funding requirements for the WRS.[149] In 1989, when the actuary recommended (and the ETF Board approved) changing the assumed rate from 7.5 percent to 7.8 percent, the DETF recalculated the remaining unfunded liability using the new assumed rate.[150] As a result, the aggregate unfunded liability of all employers as carried on DETF's books, was reduced by $90,589,521.[151] In 1991, when the actuary recommended (and the ETF Board approved) changing the assumed rate from 7.8 percent to 8.0 percent, the DETF recalculated the remaining unfunded liability using the new assumed rate.[152] As a result, the aggregate unfunded liability of all employers as carried on DETF's books, was reduced by $59,477,500.[153] No legal challenge to these actions was made.[154] In 1994, when the actuary recommended (and the ETF Board approved) changing the across-the-board salary increase assumption from 5.6 percent to 5.3 percent, the DETF recalculated the remaining unfunded liability of employers, using the new salary increase assumption.[155] As a result, the aggregate unfunded liability of all employers as carried on DETF's books

---

[149] Stipulation of Facts at ¶ 33; *Wisconsin Retirement System, supra,* at 31–32, 40.

[150] Stipulation of Facts at ¶ 33.

[151] Stipulation of Facts at ¶ 33.

[152] Stipulation of Facts at ¶ 33.

[153] Stipulation of Facts at ¶ 33.

[154] Stipulation of Facts at ¶ 33.

[155] Stipulation of Facts at ¶ 33.

was reduced by $85,117,420.[156] No legal challenge to this action was made.[157]

¶ 52. In February 1998, however, the Secretary of DETF asked the Attorney General whether the ETF Board had authority to adjust unfunded liability, to reflect later adjustment to actuarial assumptions.[158] On January 15, 1999, Assistant Attorney General Jane Hamblen replied on behalf of the Attorney General, stating that there was no statutory authority for the ETF Board to adjust the unfunded liability balance of employers even when the WRS actuary subsequently recommended changes in the actuarial assumptions that were used when the initial unfunded liability balance was determined.[159] Since receipt of this reply, the ETF Board has not made any recalculations of the unfunded liability balance.[160]

¶ 53. Act 11 authorizes DETF to adjust the unfunded liability balance of the WRS and of each employer to reflect changes in certain assumptions used to value the liabilities of the WRS, if the actuary recommends and the ETF Board approves the changes.[161]

## III. PROCEDURAL HISTORY

¶ 54. Seven days after Governor Tommy Thompson signed Assembly Bill 495 into law, the Employee Trust Funds Board, the Department of Employee Trust Funds, and Eric O. Stanchfield, Secretary of the

---

[156] Stipulation of Facts at ¶ 33.

[157] Stipulation of Facts at ¶ 33.

[158] Stipulation of Facts at ¶ 34.

[159] Stipulation of Facts at ¶ 34.

[160] Stipulation of Facts at ¶ 34.

[161] 1999 Wis. Act 11, § 15 (creating Wis. Stat. § 40.05(2)(cm)).

Department of Employee Trust Funds, filed in this court a petition for preliminary injunction, or, alternatively, a writ of prohibition, to block implementation of Act 11. The three petitioners also filed a petition for leave to commence an original action and to have their petition stand as a complaint seeking declaratory judgment. They named as respondents Secretary Lightbourn and State Treasurer Voight. Five days later, on December 28, 1999, WEAC moved to intervene as a respondent. On December 29, 1999, we preliminarily enjoined implementation of the Act, which was scheduled to take effect the following day. In our order, we directed the Wisconsin Department of Administration to respond to the Board's petition.

¶ 55. On January 12, 2000, the court modified its order and required, among other things, memoranda on whether the petitioners had standing to question the constitutionality of the Act and whether realignment of the parties would be required to provide for parties with proper standing to challenge and defend the constitutionality of the Act.

¶ 56. On January 28, 2000, WPPA and SEA separately moved to intervene as petitioners, also asking for leave to commence an original action.

¶ 57. On February 10, 2000, we ruled that the ETF Board's petition was not proper because the Board had no authority as a state agency to challenge the constitutionality of Act 11. *See Columbia County v. Bd. of Trustees of Wis. Ret. Fund*, 17 Wis. 2d 310, 317–19, 116 N.W.2d 142 (1962). At the same time, we granted all motions to intervene, ordered the proposed complaint of WPPA to serve as the complaint in this action, and designated WPPA and SEA as petitioners. Lightbourn, Voight, and WEAC were designated as respondents. We ordered the parties to prepare a stipu-

lation of facts and appointed Reserve Circuit Judge Michael J. Barron to oversee the process of preparing the stipulation. Ultimately, Judge Barron's findings of fact, based upon the stipulation, were filed with the court on April 10, 2000. In the meantime, we granted SEA permission to supplement the WPPA complaint with its own claims.

¶ 58. On May 25, 2000, we accepted original jurisdiction of this case.

¶ 59. WPPA and SEA make the following claims:

1. WPPA contends that the $4 billion distribution from the TAA violates Wis. Stat. § 40.19(1) and is an unconstitutional taking of property and an unconstitutional impairment of contract.

2. WPPA and SEA contend that the $200 million portion of the total funds distributed to the employer reserve and earmarked as a credit for employers against unfunded liability, violates Wis. Stat. § 40.19(1) and is an unconstitutional taking of property and an unconstitutional impairment of contract.

3. WPPA and SEA contend that the legislative modifications to the statutory assumed rate and the statutory across-the-board salary increase rate usurp the ETF Board's authority, thereby impairing their contract rights under Wis. Stat. § 40.19(1), and that the rate changes are otherwise unconstitutional.

4. WPPA contends that raising the 65 percent benefit cap by 5 percent for all employees except protective occupation employees violates the equal protection clause of the United States Constitution and Article I, Section 1 of the Wisconsin Constitution.

5. SEA contends that Act 11 is unconstitutional because it failed to pass the Wisconsin legislature by a three-fourths vote of all the members elected to both houses of the legislature and it fails to provide suffi-

cient state funds to cover the cost of increased benefits as required by Article IV, Section 26 of the Wisconsin Constitution.

## IV. ANALYSIS

¶ 60. Before we examine each of the claims presented to this court, we reaffirm the legal standards guiding our decision.

¶ 61. The court entertains this original action pursuant to our authority under Article VII, Section 3(2) of the Wisconsin Constitution. The petitioners ask this court to issue a declaratory judgment that certain portions of Act 11 are unconstitutional.[162]

¶ 62. To succeed in a challenge to the constitutionality of Act 11, the petitioners must show that the Act is unconstitutional beyond a reasonable doubt. *Retired Teachers*, 207 Wis. 2d at 18; *State ex rel. Hammermill Paper Co. v. La Plante*, 58 Wis. 2d 32, 46, 205 N.W.2d 784 (1973).

¶ 63. When a court examines the constitutionality of a statute, it is not concerned with the wisdom of the legislative enactment. *Hammermill Paper Co.*, 58 Wis. 2d at 47. A court is "judicially concerned only when the statute clearly contravenes some constitutional provision." *Gottlieb v. City of Milwaukee*, 33 Wis.

___

[162] None of the parties has argued that this matter is not sufficiently justiciable for declaratory relief. We need not address in detail, therefore, the four-part justiciability test this court has developed to measure the appropriateness of declaratory relief. *See Miller Brands-Milwaukee, Inc. v. Case*, 162 Wis. 2d 684, 694, 470 N.W.2d 290 (1991). Nevertheless, we find that this matter is rightly before the court as an action for declaratory judgment.

2d 408, 415–16, 147 N.W.2d 633 (1967) (citing *Chicago & N.W. Ry. Co. v. La Follette*, 27 Wis. 2d 505, 521, 135 N.W.2d 269 (1965)). When a court reviews the constitutionality of a statute, it scrutinizes an exercise of power by a separate branch of state government. Our review is independent but deferential. Our duty is to uphold a legislative act if at all possible. *Hammermill Paper Co.*, 58 Wis. 2d at 47; *Gottlieb*, 33 Wis. 2d at 415.

¶ 64. Our duty to uphold legislation whenever possible is embodied in the principle that every legislative act is presumed constitutional. *Hammermill Paper Co.*, 58 Wis. 2d at 47 (citing *Gottlieb*, 33 Wis. 2d at 415). Thus, "wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality." *Id.* at 46. "If there is any reasonable basis upon which the legislation may constitutionally rest, the court must assume that the legislature had such fact in mind. . . ." *State ex rel. Carnation Milk Prods. Co. v. Emery*, 178 Wis. 147, 160, 189 N.W. 564 (1922).

A. Three-Fourths Vote

¶ 65. *SEA contends that Act 11 is unconstitutional because it failed to pass the Wisconsin legislature by a three-fourths vote of all the members elected to both houses of legislature.*

¶ 66. SEA raises what we regard as a threshold issue: whether 1999 Assembly Bill 495 failed to pass the Wisconsin legislature by a three-fourths vote of all the members elected to both houses of the legislature, contrary to Article IV, Section 26 of the Wisconsin Constitution. SEA's challenge threatens the validity of the entire Act and, consequently, it must be addressed first.

¶ 67. Article IV, Section 26 of the Wisconsin Constitution provides in relevant part as follows:

(1) The legislature may not grant any extra compensation to a public officer, agent, servant or contractor after the services have been rendered or the contract has been entered into.

. . .

(3) Subsection (1) shall not apply to increased benefits for persons who have been or shall be granted benefits of any kind under a retirement system when such increased benefits are provided by a legislative act passed on a call of ayes and noes by a three-fourths vote of all the members elected to both houses of the legislature and such act provides for sufficient state funds to cover the costs of the increased benefits.

¶ 68. The text of Article IV, Section 26 raises several questions of interpretation that require us to review the history of the section, which has been amended five times since its inclusion as part of the original constitution.

¶ 69. At the beginning of the last century, Article IV, Section 26 consisted of a single sentence:

Extra compensation. Section 26. The legislature shall never grant any extra compensation to any public officer, agent, servant or contractor, after the services shall have been rendered or the contract entered into; nor shall the compensation of any public officer be increased or diminished during his term of office.

¶ 70. In 1921, the legislature approved a Teachers' Retirement Act that contained several features of the present retirement system. Ch. 459, Laws of 1921. The act provided pensions for teachers already in ser-

vice and computed the pensions to reflect the teachers' entire service before and after enactment of the law. When the act was challenged in our court, the question presented was whether the credit for past service for teachers still employed was "extra compensation" in violation of Section 26. This court concluded that the purpose of the law was to promote a higher efficiency in the state's educational system by retaining seasoned and experienced teachers. *State ex rel. Dudgeon v. Levitan*, 181 Wis. 326, 339, 193 N.W. 499 (1923). The court explained that enactment of a pension system would attract future entrants into the teaching profession, but failure of that pension system to consider past service by teachers already working would generate dissatisfaction, "causing the older teachers either to drop out of the service or to continue in service with abated interest and devotion." *Id.* at 341. The court observed:

> We do not think it necessarily follows that because the legislature, in its attempt to construct an enduring and efficient pension system, saw fit to base the annuity which teachers already in service are to be awarded in part upon the service rendered prior to the enactment of the law, it was its dominant purpose or intent to award such teachers extra compensation for services already rendered.

*Id.* at 342. The court went on:

> As we view it, the annuity based on past service is not intended to be, or operate as, compensation for past service. It was rather intended to be, and in fact is, an inducement to the seasoned and experienced teacher to remain in the service and give the public the benefit of his experience. We think there was plenty of room for the legislature to determine

that the ultimate success of the pension system itself required special consideration of those constituting the educational forces of the state at the time of the enactment of the law, not as compensation for prior service but rather as an inducement to them to remain in the service, to the great benefit of our educational institutions.

*Id.* at 343.

¶ 71. Three decades after *Dudgeon*, the court was confronted with a more difficult question: whether the legislature could appropriate funds to increase retirement benefits for teachers "who had retired before June 30, 1951." *State ex rel. Thomson v. Giessel*, 262 Wis. 51, 65, 53 N.W.2d 726 (1952) (*Giessel I*). This legislative plan was retroactive; no future service was required of the retired teachers to qualify for the pension increase. The court concluded that the plan was unconstitutional, stating that the effect of the law was "to grant extra compensation to public servants after the services are rendered. . .in violation of sec. 26, art. IV of the state constitution." *Id.* The court added:

It has not escaped the attention of the court that a decision sustaining an increase of benefits for already retired teachers would clear the way for legislation increasing benefits for all public employees, including judges, granted by the legislature from time to time after their retirement, and such a decision would be consonant with the selfish interests of the court. Nevertheless, as we read sec. 26, art IV, Const., this would involve an exception to a clear and unmistakable command. *If exceptions are to be made, they should not come from the legislature or the court but from those whose proper function it is to amend the constitution.*

*Id.* at 64 (emphasis added).

¶ 72. Justice George Currie dissented from the decision, writing:

> In my opinion the time has come when this court should take one further forward step. . .and declare that sec. 26, art. IV of the constitution, has no application to pension or annuity benefit pay to retired public servants pursuant to a genuine retirement system embodying an otherwise valid statute or ordinance serving a public purpose.
>
> To hold, as the majority does, that the state is powerless to increase retirement benefits to retired public servants. . .is to place all retirement systems for public servants in a strait jacket, thus rendering it impossible that such retirement benefits shall serve the original purpose intended.

*Id.* at 66 (Currie, J., dissenting).

¶ 73. The legislature responded to the *Giessel I* decision by passing a law directed to "emergency substitute teachers," that is, retired teachers who signed up for potential service as substitutes. *See* § 2, ch. 434, Laws of 1953. The law compensated retired teachers for making themselves available for service as substitutes, whether or not they actually served, and the compensation for that potential service was essentially the same as the compensation struck down in *Giessel I*. In *State ex rel. Thomson v. Giessel*, 265 Wis. 558, 61 N.W.2d 903 (1953) (*Giessel II*), the court upheld the legislature's plan, dismissing the contention that the new law was a subterfuge. The law required retired teachers to sign up for future service as a prerequisite for the "compensation." This tie to future service saved the legislation. "The act must be construed as authorizing a contract by which the state rehires retired teachers. . . .The payments provided by the act are not

intended to be compensation for past services." *Giessel II*, 265 Wis. at 565–66.

¶ 74. Before the second *Giessel* decision was issued, the legislature commenced work on a constitutional amendment, as suggested in *Giessel I*. The amendment eventually added the following sentence to Article IV, Section 26 of the Constitution:

> This section shall not apply to increased benefits for teachers under a teachers' retirement system when such increased benefits are provided by a legislative act passed on a call of the yeas and nays by a three-fourths vote of all the members elected to both houses of the legislature.

¶ 75. This 1956 amendment introduced two new concepts to Section 26. One was the concept of "increased benefits. . .under a. . .retirement system." The second was "a legislative act" passed "by a three-fourths vote of all the members elected to both houses of the legislature."

¶ 76. Teachers were not the only object of legislative concern. For instance, beginning in 1945, the legislature made counties with a population of less than 500,000 eligible to join the Wisconsin Retirement Fund. *Columbia County*, 17 Wis. 2d at 313–14; Wis. Stat. § 66.90(4) (1945). By 1961, more than 40 counties had done so. *Columbia County*, 17 Wis. 2d at 314. In 1961, the legislature mandated that all remaining counties with a population of less than 500,000 be brought into the system. § 2, ch. 459, Laws of 1961. Inevitably, this meant recognition of prior service by continuing employees. Because of the cost this would entail, state aids were provided to all counties participating in the fund that had heavy property tax levies

for contributions to the fund. *Columbia County*, 17 Wis. 2d at 314.

¶ 77. Eight counties resisted the new legislation, and some of their taxpayers challenged the law. *Id.* at 313. They argued in part that the 1961 law constituted a grant of extra compensation to public officers, agents, or servants after their services had been rendered. *Id.* at 326. The taxpayers objected to the legislature's mandatory subjection of the counties to the fund, requiring contributions from taxes to support retirement benefits. They said that withholding state aids if contributions were not paid as well as providing reimbursement aids to assist certain counties in making payment amounted to "a legislative grant of extra compensation." *Id.*

¶ 78. The court declared that "sec. 26, art. IV, does not apply to counties." *Id.* It ruled that state aids for contributions to the fund were not extra compensation by the state. *Id.* at 327. It rejected the argument that "some future service is necessary in consideration for the payment of past-service credits." The court said:

> The basic answer lies in the concept that contributions made to the pension fund are not compensation, much less extra compensation paid to public officers, agents, or servants. The payment of contributions may ultimately under some conditions inure to the benefit of the employee in the form of a pension benefit but this is not absolute or necessarily so and does not amount to compensation as that term is used in sec. 26, art. IV of the constitution.

*Id.* at 327–28.

¶ 79. The 1962 *Columbia County* decision, written by Justice E. Harold Hallows, was unanimous. In

effect, it embraced the argument that Justice George Currie had made in *Giessel I* ten years earlier.

¶ 80. In 1974, however, Article IV, Section 26 was amended again. The sentence added in 1956 was modified to read:

> This section shall not apply to increased benefits for persons who have been or shall be granted benefits of any kind under a retirement system when such increased benefits are provided by a legislative act passed on a call of yeas and nays by a three-fourths vote of all the members elected to both houses of the legislature, which act shall provide for sufficient state funds to cover the costs of the increased benefits.

¶ 81. The 1974 amendment made several changes to Section 26. First, it struck out the word "teachers" and replaced it with the phrase "persons who have been or shall be granted benefits." Second, it modified the word "benefits" with the additional phrase "of any kind." Third, it struck out the word "teachers'" before the term "retirement system" so that "retirement system" thereafter appeared in the text without qualification. Fourth, it added the clause "which act shall provide for sufficient state funds to cover the costs of the increased benefits." The fourth change was added as a floor amendment; it was not part of the original proposal. *See* Senate Amendment 1 to 1971 Senate Joint Resolution 3.

¶ 82. Although Section 26 has been amended on three other occasions—in 1967, 1977, and 1992—the other amendments are not relevant to the current litigation.

¶ 83. SEA contends that Act 11, by providing increased benefits, "including" the increase in benefit

multipliers and the cap increase for the initial formula-based annuity for most active participants, violates Section 26 because it did not pass the legislature on a call of ayes and noes by "a three-fourths vote of all the members elected to both houses of the legislature."[163] Wis. Const. art. IV, § 26. Another relevant provision is the $4 billion recognition from the TAA because it has the effect of sending approximately $1.064 billion into the employee accumulation reserve account to increase the accounts of both active and inactive participants who are not annuitants, and about $1.608 billion into the annuity reserve to increase annuities for annuitants.[164] This latter increase is treated as a permanent increase in the annual annuity payment unless the system experiences such serious difficulty at some point that it is unable to continue to pay the increment.[165] This increase is not guaranteed by the state, but it is not expected to decline unless the system becomes troubled.

¶ 84. Respondents argue that Article IV, Section 26 is inapplicable to Act 11.[166] Respondents Lightbourn and Voight argue that subsection (1) of the section does not serve as a bar to increased benefits for persons currently employed.

> The benefits about which SEA complains are not constitutionally infirm. They are granted only to

---

[163] Petitioner SEA's brief at 46.

[164] Gabriel, Roeder, Smith & Company, *Wisconsin Retirement System Actuarial Valuations of Benefit and Financing Provisions of Assembly Bill 495* 8 (Nov. 1999) (prepared for the Joint Survey Committee on Retirement Systems).

[165] *Wisconsin Retirement System, supra,* at 68–69; *see also* Wis. Stat. § 40.27(2)(c).

[166] Respondents Lightbourn and Voight's brief at 88.

those currently employed. As such, they are not subject to the provisions of Wis. Const. art. IV, § 26, which is limited in its application to benefits for those no longer in government employment.[167]

¶ 85. Respondent WEAC adds that: "If the benefit improvements enacted by the legislature do not violate subsection (1), the exception in subsection (3) does not come into play. Act 11 does not violate subsection (1) as it only provides benefits to those who remain in covered employment after the passage of Act 11."[168]

¶ 86. WEAC relies on *Dudgeon*, 181 Wis. 326, *Giessel I*, 262 Wis. 51, *Giessel II*, 265 Wis. 558, and *Columbia County*, 17 Wis. 2d 310, in reaching the same conclusion as Lightbourn and Voight.[169]

¶ 87. The difficulty with this analysis is that the cases cited predate the 1974 constitutional amendment. Moreover, there is minimal discussion in the WEAC brief of de facto benefit increases for annuitants—persons who have already retired—and for some non-annuitants who are no longer active participating employees. It is not self-evident that a constitutional provision that addresses "increased benefits for persons who have been or shall be granted benefits of any kind under a retirement system when such increased benefits are provided by a legislative act" has no application whatever to Act 11. Considering the history of pension litigation in the last century, it is at least arguable that the 1956 and 1974 amendments to Article IV, Section 26 have caused Section 26(3) to apply to both prospective and retroactive benefit increases for participants in the WRS.

---

[167] Respondents Lightbourn and Voight's brief at 92.

[168] Respondent WEAC's brief at 69.

[169] Respondent WEAC's brief at 70–74.

¶ 88. This court is being invited to hold (1) that Section 26 has no application to future benefit increases voted by the legislature, regardless of the unfunded liability created by the increases, and (2) that Section 26 has no application to annuity increases voted by the legislature so long as the money to pay for the annuity increases comes out of trust funds. If we so rule, we necessarily determine that these species of benefit increases require only a majority vote in each house of the legislature.

¶ 89. In the case at hand, we are not required to determine the scope of Section 26 coverage *if* 1999 Assembly Bill 495 "passed on a call of ayes and noes by a three-fourths vote of all the members elected to both houses of the legislature."

¶ 90. The State Assembly now has 99 elected members.[170] The State Senate has 33 elected members. The parties have stipulated that Assembly Bill 495 passed the Assembly on October 6, 1999, by a vote of 79 ayes and 20 noes, and it passed the Senate the same day by a vote of 23 ayes and 10 noes. The parties stipulate that "AB 495 did not pass the Senate by a three-fourths vote."[171]

¶ 91. The legislature has approved Joint Rules covering procedural matters of interest to both houses. Joint Rule 12 provides in part:

> JOINT RULE 12. Required vote total. (1) Unless a different and higher total vote is required by the state constitution for a specific action, all questions are decided by a majority of a quorum.

[170] In 1956, at the time the three-fourths vote amendment passed, the Assembly had 100 members. *See* Wis. Stat. § 4.01 (1957).

[171] Stipulation of Facts at ¶ 52.

571

(2) As required by the state constitution, each of the following bills requires such higher affirmative vote total for passage (or concurrence) in either house. The vote shall be taken by ayes and noes and shall be so recorded in the journal.

(a) Three-fourths of all members elected to each house are necessary to approve any bill to grant increased retirement fund benefits under section 26 of article IV of the constitution.

*State of Wisconsin Joint Rules* 8 (1999) (as last affected by 1999 A.J.R. 18) [hereinafter Joint Rule 12].

¶ 92. The language in Section 26 under scrutiny is "three-fourths vote of all the members elected to both houses of the legislature." Joint Rule 12 interprets this language to mean a vote of "[t]hree-fourths of all members elected to each house." Joint Rule 12(2)(a).

¶ 93. Joint Rule 12 serves as a valuable interpretation of the constitution by the legislative branch. Ultimately, however, the judiciary must determine what the law is. We note that the language in Section 26 is different from at least one other provision of the constitution requiring an extraordinary vote. Article VII, Section 13 provides that a "justice or judge may be removed from office by address of both houses of the legislature, if two-thirds of all the members elected to *each* house concur therein" (emphasis added). *See also* Wis. Const. art. VIII, §§ 6 and 7(2)(e), and art. XII, § 1 (provisions that refer to "each house"). Thus, the issue before us is whether a bill subject to Article IV, Section 26(3) requires passage by a vote of three-fourths of all members elected to *each* house, or whether the requisite total may be obtained by adding the votes in each house to equal three-fourths of the total membership of both houses.

¶ 94. The 1956 constitutional amendment that included the three-fourths vote provision began as Senate Joint Resolution 21 in the 1953 session. The Joint Resolution was introduced on March 1, 1953, at the request of Senator Charles Brees. The resolution described the proposed amendment as an amendment "relating to extra compensation of public officers and employees."[172] The original resolution contained the following clause: "unless such extra compensation or increase or decrease in compensation is agreed to, on a call of yeas and nays, by three-fourths of all the members elected to *each* house of the legislature." 1953 S.J.R. 21 (emphasis added). A subsequent Senate amendment changed the text to: "This section shall not apply to increased benefits for teachers under a teachers' retirement system when such increased benefits are provided by a legislative act passed on a call of yeas and nays by a three-fourths vote of all the members elected to *both* houses of the legislature." Senate Substitute Amendment 1 to 1953 S.J.R. 21 (emphasis added).

¶ 95. We think the language change is significant. Inasmuch as the resolution began with language referring to "three-fourths vote of all the members elected to each house" and ended with language referring to "three-fourths vote of all the members elected to both houses," we conclude that the legislature intended to permit passage of a bill increasing benefits under a retirement system when the bill has received the votes of three-fourths of the entire elected membership of the legislature. This three-fourths vote does not, however, replace the requirement elsewhere in the constitution

---

[172] The relating clause of the joint resolution remained intact throughout the legislative process.

that a bill must pass each house before it may be sent to the governor to become law. It adds to that requirement.

¶ 96. Given our interpretation of Section 26, if each house of the legislature were to comply with Joint Rule 12, there would not be a dispute about whether a retirement bill had received the requisite number of votes.[173] However, if either house did not comply with Joint Rule 12, it would prevent the other house from passing the bill unless the other house were able to muster the difference between 99 total votes and the majority vote in the first house. . .even though three-fourths of the members of the second house had approved the bill.

¶ 97. In this case, we conclude that because Assembly Bill 495 received 79 votes in the Assembly and 23 votes in the Senate, the bill received a total of 102 votes from the members elected to both houses of the legislature, and that number is more than the three-fourths vote required by Section 26 of the constitution.

¶ 98. Before examining each of the petitioner's substantive challenges, we turn to a discussion of participant interests and the rights that flow from them.

B. Participant Rights

¶ 99. The WRS has approximately 460,000 participants. A participant is defined as "any person included within the provisions of the Wisconsin retire-

___

[173] By its terms, Joint Rule 12 requires 75 votes in the Assembly and 25 votes in the Senate to approve a bill to grant "increased retirement fund benefits under section 26 of article IV of the constitution."

ment system by virtue of being or having been a participating employee whose account has not been closed." Wis. Stat. § 40.02(45).

¶ 100. Every participant has interests and rights in the Wisconsin retirement system. Every participant is either an annuitant or a potential annuitant (with an individual account in the employee reserve). Thus, each participant has a property interest in his or her annuity or individual account, and a right to protect that interest. Beyond this narrow individual interest, each participant has a broad property interest in the WRS as a whole.[174]

¶ 101. Participants fall into several categories and multiple subcategories. As a result of their status, different participants have different interests. Active participating employees share many interests in common with annuitants and "inactive participants" who are not yet eligible to receive an annuity. But participants in one category might strongly oppose a proposal in the legislature or an action by the ETF Board that participants in another category would find quite satisfactory. As an example, annuitants might be pleased if the legislature distributed all money in the TAA to the various accounts and reserves in the fixed trust because such a distribution would produce a short-term bonanza for them from the money sent to the annuity reserve. However, many active participating employees would view such a move as destructive to their position for the future. Correspondingly, some active participating employees might prefer to limit or stop distributions from the TAA. . .until they were ready to retire. Locking up the TAA would not please

--------

[174] *Retired Teachers*, 207 Wis. 2d at 19 (citing *Ass'n of State Prosecutors*, 199 Wis. 2d at 558).

current annuitants, however, especially when investments are doing well.

¶ 102. Participants have different property interests. An active participating employee has a clear property interest in his or her own account, but that same employee has no property interest in a retiree's annuity. Each annuity belongs to the annuitant.

¶ 103. The principle that different participants have different property interests is illustrated in two recent cases. In *Association of State Prosecutors v. Milwaukee County*, 199 Wis. 2d 549, 552, 544 N.W.2d 888 (1996), this court said: "We hold that vested employees and retirees have protectable property interests in their retirement trust funds which the legislature cannot simply confiscate under the circumstances of this case."

¶ 104. The court's choice of language was careful and deliberate. It implied that employees and former employees who are part of the same system do not all have the same interests or the same rights. The court held that 42 former assistant district attorneys of Milwaukee County who chose to become part of the WRS after assistant district attorneys became state employees did not have a property interest that would permit them to remove money from the Milwaukee County employee retirement system to fund past service credit in the WRS. The court said they did not have a property interest because they were not vested in the Milwaukee County system. If they had been vested, they might have remained in the Milwaukee system. By contrast, Milwaukee County employees who were vested in the Milwaukee system had a right to prevent money from

being taken out of that system for non-trust purposes.[175]

¶ 105. A second example of diverse legal interests in property appeared in *Retired Teachers*, 207 Wis. 2d 1. The 1987 legislature approved a special investment performance dividend (SIPD) as part of a $230 million distribution from the TAA. 1987 Wis. Act 27. The targeted recipients of the dividend were pre–1974 annuitants who were included in the annuity reserve. These pre–1974 annuitants received less benefits than post–1974 annuitants because their base annuities were not improved as a result of post–1974 formula enhancements. Because of the discrepancy in benefits among annuitants, the legislature attempted to use money in the TAA to enhance the annuities of roughly 25 percent of the entire class of annuitants—at the expense of 75 percent of the same class. We held unanimously that this legislative action constituted a taking from the annuitants who received no benefits. The court said: "[W]e must determine whether the SIPD legislation 'takes' the *plaintiff annuitants*' property interest in having annuity reserve account surpluses distributed in the manner prescribed by § 40.27(2). To the extent that the legislation violates the plaintiffs' § 40.27(2) rights, it effectively takes those rights." *Retired Teachers*, 207 Wis. 2d at 20 (emphasis added).

¶ 106. Our court found the 1987 legislation deficient in several respects, but we did not state or imply that any participant other than a post–1974 *annuitant* could claim a "taking." No participant other than an

---

[175] We never suggested that the 42 former assistant district attorneys would not have rights in the future if they rejoined the county's work force. We never said that the attorneys would have no standing to protect the Milwaukee system if it were being grossly mismanaged.

annuitant had any property interest in the annuity reserve.

¶ 107. Four decades ago, this court said that teachers have "a contractual relationship with the state and a vested right in the state teachers' retirement system." *State Teachers' Ret. Bd. v. Giessel,* 12 Wis. 2d 5, 9, 106 N.W.2d 301 (1960) *(Giessel III).* These general principles are sound. Our task is to restate them in a contemporary context, attempting to articulate a more complete statement of the property interests and rights enjoyed by participants.

1. Wisconsin Stat. § 40.19(1)

¶ 108. The first source of property interests and rights is Wis. Stat. § 40.19, which is entitled "Rights preserved." This section applies not only to the WRS but also to the entire public employee trust fund. Wisconsin Stat. § 40.19(1) reads as follows:

> 40.19 Rights preserved. (1) Rights exercised and benefits accrued to an employee under this chapter for service rendered shall be due as a contractual right and shall not be abrogated by any subsequent legislative act. The right of the state to amend or repeal, by enactment of statutory changes, all or any part of this chapter at any time, however, is reserved by the state and there shall be no right to further accrual of benefits nor to future exercise of rights for service rendered after the effective date of any amendment or repeal deleting the statutory authorization for the benefits or rights. This section shall not be interpreted as preventing the state from requiring forfeiture of specific rights and benefits as a condition for receiving subsequently enacted rights and benefits of equal or greater value to the participant.

¶ 109. We note that the first sentence of subsection (1) uses the word "employee." The last sentence uses the word "participant." We do not think the word "employee" in the subsection limits the scope of rights preserved to active participating employees. Rather, it covers all participants in the WRS because all participants have been employees at one time or another. For this proposition, we point to *Retired Teachers*, where this court said: "The parties do not dispute, and we agree, that WRS *annuitants* have a property interest in the WRS. The *annuitants'* interest finds its genesis both in chapter 40 and in prior decisions of this court." 207 Wis. 2d at 18 (emphasis added). We then cited Wis. Stat. § 40.19(1) and quoted from it as authority for these statements.

¶ 110. Wisconsin Stat. § 40.19(1) requires a balancing of interests. An employee has certain contractual rights that may not be abrogated by any subsequent legislative act. However, the state retains the right to amend or repeal, by enactment of statutory changes, any part of the entire chapter "and there shall be no right to further accrual of benefits nor to future exercise of rights for service rendered *after* the effective date of any amendment or repeal deleting the statutory authorization for the benefit or rights." Wis. Stat. § 40.19(1) (emphasis added). Moreover, the state is not prevented by the first sentence in the subsection from "requiring forfeiture of specific rights and benefits as a condition for receiving subsequently enacted rights and benefits of equal or greater value to the participant," as provided in the last sentence. *Id.*

¶ 111. All participants who have "benefits accrued" are protected by § 40.19(1) from the abrogation of those benefits unless the benefits are replaced by benefits of equal or greater value. Determining what "rights exercised" or "rights" may not be abrogated is less clear. We agree with respondents Lightbourn and Voight, however, that "Section 40.19 provides a limited contractual right that does not extend to every provision of ch. 40 or every procedural or substantive aspect of the WRS—it extends only to 'rights exercised and benefits accrued' which are 'due' for 'service rendered.' "[176]

¶ 112. We would understand a contention that a participating employee had a right to exercise one of several monetary options at retirement if those options had existed during the period when the participating employee was rendering service but were then eliminated before the employee's retirement. Such a claim would be different from a contention that a participant had a right to maintain some operating procedure in the WRS that had existed during a period that the participant was rendering service.

2. Wisconsin Stat. § 40.01

¶ 113. A second source of participant property interests and rights is Wis. Stat. § 40.01. This section sets out the nature and purpose of the public employee trust fund:

> 40.01 Creation and purpose. (1) CREATION. A "public employee trust fund" is created to aid public employees in protecting themselves and their bene-

---

[176] Respondents Lightbourn and Voight's brief at 14.

ficiaries against the financial hardships of old age, disability, death, illness and accident, thereby promoting economy and efficiency in public service by facilitating the attraction and retention of competent employees, by enhancing employee morale, by providing for the orderly and humane departure from service of employees no longer able to perform their duties effectively, by establishing equitable benefit standards throughout public employment, by achieving administrative expense savings and by facilitating transfer of personnel between public employers.

(2) PURPOSE. The public employee trust fund is a public trust and shall be managed, administered, invested and otherwise dealt with solely for the purpose of ensuring the fulfillment at the lowest possible cost of the benefit commitments to participants, as set forth in this chapter, and shall not be used for any other purpose. Revenues collected for and balances in the accounts of a specific benefit plan shall be used only for the purposes of that benefit plan, including amounts allocated under s. 20.515(1)(um) or (ut) or 40.04(2), and shall not be used for the purposes of any other benefit plan. Each member of the employee trust funds board shall be a trustee of the fund and the fund shall be administered by the department of employee trust funds. All statutes relating to the fund shall be construed liberally in furtherance of the purposes set forth in this section.

¶ 114. Subsection (1) explains the policy objectives of the trust fund. The fund is created, in part, "to aid public employees in protecting themselves and their beneficiaries against the financial hardships of old age" and death. Subsection (2) declares that the trust fund "is a public trust and shall be managed, administered, invested and otherwise dealt with solely

581

for the purpose of insuring the fulfillment at the lowest possible cost of the benefit commitments to participants. . .and shall not be used for any other purpose."

¶ 115. Like the previously discussed section, Wis. Stat. § 40.01(2) reveals a certain internal tension. Subsection (2) states explicitly that the fund shall be managed and otherwise dealt with solely for the purpose of insuring the fulfillment of benefit commitments to participants. . .but "at the lowest possible cost." Insuring the fulfillment of benefit commitments "at the lowest possible cost" is different from maximizing benefits irrespective of cost. The subsection requires some balancing of competing interests.

¶ 116. Wisconsin Stat. § 40.01 provides specific safeguards to participants. First, trust fund money must be used for proper trust purposes. This principle is illustrated in several cases. In *Giessel III*, the Board resisted paying for a study of retirement systems from retirement fund assets, as required in legislation. The court agreed:

> The question. . .is whether the expense for the governor's study commission. . .is a proper expense of the retirement system. . . .The cost of adequately informing the legislature and the governor so that they may intelligently perform their duties is not a proper expense of the teachers' retirement fund.

12 Wis. 2d at 10–11.

¶ 117. In the *Retired Teachers* case, the court rejected a legislative directive that the annuity reserve reimburse the state's general fund for certain supplemental benefits paid to pre–1974 annuitants. We said:

Section 40.27(2) governs the distribution of investment earnings of the annuity reserve, and it anticipates payments only to annuitants. The section is utterly devoid of any authority for using annuity reserve funds to reimburse a governmental entity for non-trust obligations. We therefore conclude that the Act further violated § 40.27(2) by mandating a reimbursement for interim GPR supplemental benefits, a non-trust obligation.

207 Wis. 2d at 23.

¶ 118. A similar principle was set out in *Association of State Prosecutors* with respect to payments from the Milwaukee retirement system to the WRS. 199 Wis. 2d at 562–63. We said: "[T]he state cannot simply 'reach' into the County Plan to pay for obligations [the state] has incurred." *Id.* at 563. Transferring funds to the WRS was labeled a non-trust purpose.

¶ 119. Second, legislative action affecting the WRS must be consistent with the stated objectives of the trust. We recognized in *Association of State Prosecutors*, 199 Wis. 2d at 563, that the legislature retains power to adjust or amend a retirement plan in certain situations, and in Wis. Stat. § 40.19(1), the legislature explicitly reserves the right to make statutory changes. But participants in the WRS are empowered to challenge legislative actions that deviate from trust objectives or cause injury to the trust.

¶ 120. Third, the ETF Board must deal with the Wisconsin retirement system in the same faithful manner as trustees would administer any trust, that is, they must exercise diligence, prudence, and absolute fidelity in managing trust assets. *Sensenbrenner v. Sensenbrenner*, 76 Wis. 2d 625, 635, 252 N.W.2d 47

(1977); *Estate of Allis*, 191 Wis. 23, 29, 209 N.W. 945, 210 N.W. 418 (1926). Act 11 does not undercut the powers and duties of the ETF Board. Rather, it reaffirms the position of the Board. *See* 1999 Wis. Act 11, § 27(3). Wisconsin Stat. § 40.01 gives participants in the system the right to test whether members of the ETF Board have upheld their fiduciary duties. *Cf. Retired Teachers*, 207 Wis. 2d at 26–27. The inability of the ETF Board to challenge the constitutionality of a legislative act affecting the WRS in court does not relieve board members of their duties as trustees.

3. Integrity and Security of Trust Fund

¶ 121. A third source of property interests and rights relates to "the integrity and security" of retirement funds. This interest is articulated in *Association of State Prosecutors*, 199 Wis. 2d at 563, but is inherent in Wis. Stat. §§ 40.01 and 40.19. Respondents Lightbourn and Voight suggest that a decrease in contributions that would threaten the actuarial soundness of the retirement fund (with no accompanying provision to provide adequate funding at an appropriate future date) and would likely result in nonpayment of or decrease in accrued benefits would violate both §§ 40.01(1) and 40.01(2).[177] Wisconsin Stat. § 40.19(1) surely confers upon participants the right to protect their accounts from either abrogation or dissipation.

¶ 122. We now turn to the petitioners' substantive challenges, applying the above-stated principles to petitioners' claims.

---

[177] Respondents Lightbourn and Voight's brief at 20.

## C. $4 Billion Distribution

¶ 123. *WPPA contends that the $4 billion distribution from the TAA violates Wis. Stat. § 40.19(1) and is an unconstitutional taking of property and an unconstitutional impairment of contract.*

¶ 124. Act 11 directs that $4 billion be distributed from the TAA to the other reserves and accounts in the fixed trust *after* the 1999 annual distribution of 20 percent. This directive is embodied in Section 27, a nonstatutory section of the Act.[178]

¶ 125. Most of the $4 billion distribution is sent into the employee, employer, and annuity reserves to fund present or future retirement benefits for participants in the WRS. The $4 billion distribution follows in lock step the earlier 20 percent distribution.

¶ 126. WPPA's claims that the $4 billion distribution is unlawful should be put in historical context. Prior to 1975, all gains and losses of the fixed retirement investment trust were fully distributed in the year the gain or loss was realized. The immediate recognition of gains and losses led to fluctuations or potential fluctuations in contribution and benefit rates from year to year. In 1973, the legislature created the

---

[178] 1999 Wis. Act 11, § 27 reads in part:

(1) TRANSFER OF FUNDS FROM THE TRANSACTION AMORTIZATION ACCOUNT OF THE FIXED RETIREMENT INVESTMENT TRUST.

(a) On December 31, 1999, after the annual distribution required under section 40.04(3)(a) of the statutes for the 1999 calendar year is made, $4,000,000,000 shall be distributed from the transaction amortization account of the fixed retirement investment trust to the reserves and accounts of the fixed retirement investment trust in an amount equal to a percentage of the total distribution determined by dividing each reserve's and account's balance on the prior January 1 by the total balance of the fixed retirement investment trust on the prior January 1.

TAA, to be effective in 1975, as an accounting mechanism to hold the investment gains and losses of the fixed trust, and it regulated the recognition of those gains or losses over time as a means of bringing stability to the system. In its early years, the TAA recorded paper deficits. Nonetheless, from 1975 through 1988, the law provided for an annual TAA distribution of 7 percent. From 1989 to the present, the statutes have provided for an annual TAA distribution of 20 percent. In 1989, the legislature changed the law to increase the percentage of distribution from 7 percent to 20 percent—and it did so without challenge.[179]

¶ 127. In 1987, the legislature authorized a one-time distribution of $230 million from the TAA. In 1989, the legislature authorized a one-time distribution of $500 million from the TAA. In each case, the distribution moved money proportionately to other accounts within the fixed trust, such as the employee, employer, and annuity reserves; and these one-time recognitions were not seriously challenged.

¶ 128. Act 11 eliminates the TAA over a five-year period and creates, in its place, a market recognition account (MRA) that is to be used for distributing the total market value investment return earned by the fixed trust. Beginning on December 31, 2000, the balance of the TAA is to be determined and then 20 percent of the balance established is to be distributed annually to the accounts in the fixed trust. After the entire balance has been distributed, DETF is directed to close the account.

¶ 129. WPPA asserts that participants in the WRS have a property right to have the investment earnings of the fixed trust distributed in the manner

---

[179] 1989 Wis. Act 13; Stipulation of Facts at ¶ 21.

set by the pre-Act 11 statute. They suggest that a statutory change deviating from the established mechanism violates participant property rights under Wis. Stat. § 40.19(1) and is unconstitutional.

¶ 130. During the last quarter century, as noted above, the TAA has been changed several times. These changes serve as precedent for the $4 billion distribution. The creation of the TAA resulting in curtailed distributions, the changes in the TAA since 1975 resulting in increased distributions, and the pending closure of the TAA all conflict with the proposition that participants in the WRS have a property right in a particular distribution mechanism frozen in time. If we approved WPPA's position, we would be concluding that past special distributions from the TAA were unlawful. If we accepted WPPA's argument, we would be holding that only 20 percent of the TAA could be distributed each year, regardless of investment performance. This position is untenable. Wisconsin Stat. § 40.19(1) specifically recognizes the authority of the legislature to enact statutory changes to Chapter 40, so long as *accrued* benefits are not abrogated.

¶ 131. WPPA contends that there has been a taking of property[180] because the $4 billion distribution will fund benefit improvements that not all partici-

---

[180] WPPA relies on the state and federal constitution for its taking claims:

The Fifth Amendment to the United States Constitution provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or

pants will enjoy equally. They point in particular to 51,000 inactive participants who (1) are credited with interest at the assumed rate of 5 percent annually, rather than the effective rate, and (2) are expected to retire and take a WRS annuity instead of electing to take a separation benefit or dying before they reach retirement age. WPPA asserts that these particular inactive employees do not receive credit for past service (as active participating employees do) and do not receive the full benefit of a distribution because the distribution to them is capped at 5 percent. This argument requires a conventional takings analysis.

1. Taking of Property

¶ 132. Our first step in analyzing an alleged taking is to determine whether a property interest exists. *Retired Teachers*, 207 Wis. 2d at 18. There is no dispute that participants have a general property interest in all the money in the TAA. *Ass'n of State Prosecutors*, 199 Wis. 2d at 558–59; *Retired Teachers*, 207 Wis. 2d at 19 (acknowledging *Ass'n of State Prosecutors*). This broad interest in the TAA as a whole provides participants with standing to protect the whole. It does not, however, afford participants an accrued property interest in every part of the whole. For instance, an annuitant cannot claim earnings from the employee accumulation reserve, and an active participating employee cannot claim earnings from the annuity reserve, even though

property, without due process of law; nor shall private property be taken for public use, without just compensation.

Article I, Section 13 of the Wisconsin Constitution provides:

The property of no person shall be taken for public use without just compensation therefor.

both kinds of earnings are recorded in the TAA. Nonetheless, participants in the WRS do have a general property interest in the $4 billion transferred from the TAA.

¶ 133. Our second inquiry in a takings analysis is to determine whether the property has been taken. *Retired Teachers*, 207 Wis. 2d at 20 (citing *Zinn v. State*, 112 Wis. 2d 417, 424, 334 N.W.2d 67 (1983)). To determine whether the property has been taken, we must examine the nature of the distributions and how Act 11 changes the way funds are distributed from the TAA.

¶ 134. Wisconsin Stat. § 40.04(3)(a) compels a yearly distribution of 20 percent from the TAA to the accounts of the fixed trust:

> (a) All earnings, profits or losses of the fixed retirement investment trust and the net gain or loss of the variable retirement investment trust shall be distributed annually on December 31 to each participating account in the same ratio as each account's average daily balance within the respective trust bears to the total average daily balance of all participating accounts in that trust. For the fixed retirement investment trust the amount to be distributed shall be the then balance of the current income account plus 20% of the then balance of the transaction amortization account.

Wis. Stat. § 40.04(3)(a).

¶ 135. On December 31, 1999, the TAA was valued at $17.3877 billion before 20 percent of that balance ($3.4775 billion) was distributed to the other accounts and reserves in the fixed trust.[181] When WPPA objects that the additional $4 billion distribu-

---

[181] Stipulation of Facts at ¶ 24.

tion will fund benefit improvements that not all participants will enjoy equally, it is making an attack that could be leveled at the 20 percent annual distribution as well.

¶ 136. To illustrate, the 20 percent annual distribution always has the potential of treating some "inactive participants" different from other "inactive participants."[182] The 20 percent annual distribution will treat participants unequally whenever the amount of money being distributed is large enough to give effective rate inactive participants a higher payment than 5 percent rate inactive participants.

¶ 137. An estimated 60,000 inactive WRS participants are credited with interest at the capped rate of 5 percent annually rather than at the effective rate.[183] This means that the remaining 44,000 inactive participants are credited with interest at the effective rate. The fact that 60,000 participants may be comparatively disadvantaged in the annual distribution from the TAA and in any other large distribution from the

---

[182] As ¶ 42 of the Stipulation of Facts explains:

There are two categories of "inactive participants". . . . In one group are those who first became covered by the WRS. . .on or before January 1, 1982 or who first became covered by the WRS after January 1, 1982 but left participating employment before March 9, 1984 (. . .the "effective rate inactive participants"). The effective rate inactive participants' accounts in the employee reserve are credited each year with interest at the "effective rate" as defined in § 40.02(23). The other group of inactive participants are those who first became covered by the WRS on or after January 1, 1982 and who were still participating employes on March 9, 1984 (. . .the "5% rate inactive participants"). The 5% rate inactive participants' accounts in the employee reserve are credited each with interest at the rate of 5%. §§ 40.04(4)(a)(2) and 40.02(6).

[183] Wis. Stat. § 40.02(23). The "effective rate" is not statutorily capped. Consequently, it reflects investment earnings more closely than the fixed 5 percent rate.

TAA does not make these distributions unconstitutional.

¶ 138. There are subcategories within each of the two classes of non-annuitants. Both active participants and inactive participants include persons who are receiving interest from the TAA at the assumed rate of 5 percent. There is no discrimination by class.

¶ 139. Benefit disparities and disparities in treatment reflect the complexity of the WRS.[184] They speak to a condition that is endemic in this large pension system, with many categories and subcategories of participants who have worked for nearly 1,200 different employers at different times in different places for different benefits. Participant interests are not identical. It would be nearly impossible for policymakers to accommodate and satisfy all participant interests at the same time.

¶ 140. The issue in this taking claim is whether a participant has been deprived of some *accrued* benefit. Here, all active and inactive employees eligible to receive part of the $4 billion distribution, including the estimated 51,000 inactive employees, received interest in the employee reserve according to a pre-existing statutory formula. They were not deprived of any accrued benefit. Moreover, inactive employees have no right to a formula enhancement for past service simply because active employees received such an enhancement. The formula enhancement for the past service of current employees must be viewed as an encouragement to these employees to remain in public service. That objective does not apply to inactive employees who have left WRS-covered employment.[185]

---

[184] Stipulation of Facts at ¶¶ 45–48.

[185] Providing improvements in the formula multiplier and interest rate or increases in the benefit caps to inactive employ-

¶ 141. WPPA quotes WRS actuaries to the effect that "[c]hanging the flow of funds from the TAA to the various fixed reserves affects the distribution of WRS benefits among individual participants."[186] This statement is true. But it does not establish that the $4 billion distribution "takes" any accrued benefit "due" for service rendered. To block the $4 billion distribution on grounds that not all participants enjoy the distribution equally would paralyze the TAA and prevent the legislature from adjusting the draw from the TAA to reflect successful investment performance.

¶ 142. The $4 billion distribution is a legitimate recognition of gains in the TAA, properly dispersed to those who are entitled to receive them. The annuity reserve receives its full share of the TAA distribution. The employee reserve receives its full share of the TAA distribution. The employer reserve receives its full share of the TAA distribution. No participant's accrued benefits are abrogated, damaged, or threatened. Most participants will receive substantial benefit improvements.

¶ 143. We conclude that WPPA has failed to show beyond a reasonable doubt any taking of property because of the $4 billion distribution from the TAA.

2. Impairment of Contract

¶ 144. WPPA also asserts that the $4 billion distribution in Act 11 constitutes an impairment of

_____

ees who have left WRS-covered employment would trigger the provisions of Article IV, Section 26 of the Wisconsin Constitution.

[186] Petitioner WPPA's brief at 40.

contract, in violation of Article I, Section 10 of the United States Constitution and Article I, Section 12 of the Wisconsin Constitution.[187] Here again, petitioners must prove beyond a reasonable doubt that Act 11 is an unconstitutional impairment of contract.

¶ 145. WPPA argues that participants have a contract for retirement benefits and that the terms of that contract are embodied in Chapter 40, of the statutes.[188] Wisconsin Stat. § 40.19(1) provides in part that "[r]ights exercised and benefits accrued to an employee under [Wis. Stat. ch. 40] for service rendered shall be due as a *contractual right* and shall not be abrogated by any subsequent legislative act" (emphasis added).

¶ 146. The United States Supreme Court has developed a three-step methodology for analyzing impairment-of-contract claims. *Chappy v. LIRC*, 136 Wis. 2d 172, 187, 401 N.W.2d 568 (1987) (citing *Energy*

---

[187] Article I, Section 10 of the United States Constitution reads:

> No state shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make any thing but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility.

Article I, Section 12 of the Wisconsin Constitution reads:

> No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed, and no conviction shall work corruption of blood or forfeiture of estate.

[188] In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State. . . .In addition, statutes governing the interpretation and enforcement of contracts may be regarded as forming part of the obligation of contracts made under their aegis.

*United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 n.14 (1977).

*Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)). This court usually follows these steps in evaluating such claims.

¶ 147. "The first step is to inquire whether the challenged statute has 'operated as a substantial impairment of a contractual relationship.' " *Id.* (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978); *Energy Reserves Group*, 459 U.S. at 411). "Minimal alteration of contractual obligations may end the inquiry at its first stage." *Allied Structural Steel*, 438 U.S. at 245. Hence, if we determine that there has been no impairment or only minimal impairment, that is the end of the analysis.

¶ 148. If the legislation substantially impairs a contractual relationship, "there must exist a significant and legitimate public purpose behind the legislation." *Chappy*, 136 Wis. 2d at 187 (citing *Energy Reserves Group*, 459 U.S. at 411). If such a purpose exists for the legislation, "the inquiry is whether the challenged legislation is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* at 188 (quoting in part *Allied Structural Steel*, 438 U.S. at 244) (quotation marks and brackets omitted).

¶ 149. Both the state and federal contracts clauses limit the power of a state to modify its own contracts. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 (1977). But these clauses are not an absolute bar to subsequent modification of a state's financial obligations. When a state is accused of impairing the obligations of its own contract, courts will scrutinize "the ability of the State to enter into an agreement that limits its power to act in the future." *Id.* at 23. If the

legislative contract is not invalid *ab initio* under the reserved powers doctrine, *id.*, the question becomes whether the legislature's impairment of the contract is reasonable and necessary to serve an important public purpose. *Id.* at 25. In reviewing that question, courts do not give the legislature the same deference they would give it if it were acting on a subject at arm's length. Rather, they factor in the state's self-interest in acting as it did.

¶ 150. We conclude that WPPA is unable to complete the first step in an impairment analysis, because the $4 billion distribution does not operate as an impairment of any property right or benefit in Chapter 40. It does not impair the contractual relationship between the state and participants.

¶ 151. According to WPPA, the $4 billion transfer deprives participants of the contractual right to have the gains of the trust fund distributed in a manner consistent with the TAA's primary purpose—smoothing the losses and gains of the fixed trust. WPPA complains that transferring $4 billion from the TAA for the alternative purpose of funding "new benefits" is not lawful *unless all* participants, including inactives, receive "equitable" benefit increases. "The purpose of the TAA [is] not to create a fund to hold investment earnings until the legislature [decides] how to use them," WPPA declares.[189] "If the legislature wants to create new benefits for some, but not all, participants, it can do so by funding those benefits with state funds or through increased contributions—not with Fund earnings."[190]

¶ 152. This argument misses the point. The TAA is an accounting mechanism, holding the investment

---

[189] Petitioner WPPA's brief at 45.
[190] Petitioner WPPA's brief at 44–45.

gains of the various accounts in the fixed trust. The TAA, like every mechanism and procedure in Chapter 40, is designed to facilitate the primary purpose of the trust set out in Wis. Stat. § 40.01. Reducing annual fluctuations in contribution and benefit rates is a worthy purpose, but this purpose does not supersede the purpose articulated in § 40.01. Funding benefit increases by recognizing gains in the TAA is fully consistent with Wis. Stat. § 40.01.

¶ 153. Chapter 40 creates a hybrid plan with characteristics of both a defined benefit plan and a defined contribution plan.[191] The $4 billion distribution funds the increases in benefits for most active participating employees. It increases annuities for 103,000 annuitants. It provides substantial account enhancements for "effective rate inactive participants." Other inactives receive precisely what the pre-Act 11 statute requires. No accrued benefits are put in jeopardy.

¶ 154. WPPA tries to suggest otherwise. It contends that "the WRS's ability to meet its obligations [is] likely to be jeopardized where Trust Fund earnings are used for a purpose other than what is intended under Wis. Stat. Chap. 40," referring to the smoothing mechanism of the TAA.[192] This contention is not supported in the record. WPPA stipulated that Act 11 will not put the trust fund in financial trouble.[193]

¶ 155. We have said that legislation that alters the "contractual expectations of the parties impairs the obligation of contract." *State ex rel. Cannon v. Moran,*

---

[191] Stipulation of Facts at ¶ 7.

[192] Petitioner WPPA's brief at 42.

[193] Stipulation of Facts at ¶ 54.

111 Wis. 2d 544, 555, 331 N.W.2d 369 (1983) (citing *Allied Structural Steel*, 438 U.S. at 245–46).

¶ 156. In *Cannon*, the legislature reduced the salaries of certain Milwaukee County circuit judges by the amount of pension benefits they received from the Milwaukee County Employees' Retirement System. Although the legislation did not take the judges' pension benefits per se, it nullified them by depriving them of their full judicial salary. We struck down the legislation as an impairment of contract. *Cannon*, 111 Wis. 2d at 563. The legislature had authorized the judges to terminate irrevocably their membership in the Milwaukee retirement system in order to join the state system, then "pulled the rug out" from under them by passing a law that reduced their salaries. *Id.* at 559. The legislation was "completely unexpected" and thus altered the judges' contractual expectations. *Id.*

¶ 157. In *Retired Teachers*, the legislature authorized a special investment performance dividend as part of a $230 million distribution from the TAA. Only 25 percent of annuitants received the dividend. The court analyzed the SIPD as a "taking" from the 75 percent of annuitants who received no dividends, not as an impairment of contract. *Retired Teachers*, 207 Wis. 2d at 17. Nevertheless, it would be hard to deny that the SIPD had altered the "contractual expectations" of the 75 percent who received nothing. *Id.* at 19–20, 23–24.

¶ 158. These cases offer a sharp contrast to the facts here. Chapter 40, provides no basis for the 5 percent rate inactive participants to expect dividends of more than 5 percent from the TAA. It provides no basis for participants to expect that all benefit caps will be raised if any benefit caps are raised. It provides no

basis for participants to expect that periodic benefit improvements will satisfy all participants equally.

¶ 159. Participants do expect that benefits will be improved when investment gains justify and permit increases. They do understand that the legislature has reserved the right to amend or repeal "all or any part of this chapter at any time" so long as the legislature does not abrogate "benefits accrued to an employee. . .for service rendered." Wis. Stat. § 40.19(1). They understand that amending the statutes is the only way the formula multiplier can be improved or the TAA distributions can be increased, and they likely consider such legislation as having a significant and legitimate public purpose. The $4 billion distribution does not constitute an impairment of contract.

¶ 160. We conclude that the $4 billion distribution is consistent with the purpose of Chapter 40, the provisions of Wis. Stat. § 40.19(1), and the integrity and solvency of the trust fund. The parties have stipulated that the trust fund is not financially troubled and the $4 billion distribution will not make it so.[194] We conclude that the $4 billion distribution does not constitute a taking of property or an impairment of contract and is not unconstitutional beyond a reasonable doubt.

D. $200 Million Credit

¶ 161. *WPPA and SEA contend that the $200 million portion of the total funds distributed to the employer reserve and earmarked as a credit for employers against unfunded liability violates Wis. Stat.*

---

[194] Stipulation of Facts at ¶ 54.

*§ 40.19(1) and is an unconstitutional taking of property and an unconstitutional impairment of contract.*

¶ 162. The $4 billion distribution from the TAA will send an estimated $1.064 billion into the employee reserve, $1.236 billion into the employer reserve, and $1.608 billion into the annuity reserve.[195]

¶ 163. Section 27(1)(b) of Act 11[196] directs that $200 million of the estimated $1.236 billion sent to the employer reserve be used as employer contribution

---

[195] Joint Survey Committee on Retirement Systems, *Wisconsin Retirement System Actuarial Valuations of Benefit and Financing Provisions* 8 (Nov. 1999).

[196] 1999 Wis. Act 11, § 27(1)(b)1 provides:

The employee trust funds board shall determine each participating employer's share of the increase in the employer accumulation reserve that results from the distribution under paragraph (a) and shall establish for each employer a credit balance in the employer accumulation reserve that equals the employer's share of the increase in the employer accumulation reserve that results from the distribution under paragraph (a), based on each employer's share of covered payroll in 1998. The total amount that shall be reserved for credit balances under this subdivision shall be $200,000,000. In lieu of requiring that an employer make required employer contributions under section 40.05 (2) (b) of the statutes, the employee trust funds board, beginning no later than March 1, 2000, shall deduct from the employer's credit balance in the employer accumulation reserve, on a monthly basis, an amount that the employer would otherwise have been required to contribute under section 40.05 (2) (b) of the statutes had there been no establishment of the credit balance from the distribution under paragraph (a). For any employer that is not required to make contributions under section 40.05 (2) (b) of the statutes, the employee trust funds board, beginning no later than March 1, 2000, shall deduct from the employer's credit balance in the employer accumulation reserve, on a monthly basis, an amount that the employer would otherwise have been required to contribute under section 40.05 (2) (a) of the statutes had there been no establishment of the credit balance from the distribution under paragraph (a). The employee trust funds board shall make such deductions until the credit balance is exhausted, at which time the

599

credits. These credits will serve in lieu of payments for employers that have unfunded liability under the WRS. Employers that do not have unfunded liability will receive credits for payments of employer required contributions. The employer contribution credits will permit each employer to suspend actual cash payments to the employer reserve until the individual employer's share of the credits has been exhausted.[197]

¶ 164. WPPA and SEA contend that section 27(1)(b) is unconstitutional as an unlawful taking and an impairment of contract. They also argue that it violates Wis. Stat. § 40.19(1) and trust principles. On the facts presented, we disagree.

¶ 165. The sole purpose of the employer reserve is to ensure the fulfillment of benefit commitments to participants at the lowest possible cost. Put differently, the sole purpose of the employer reserve is to fund the future payment of accrued benefits through a reasonable and prudent contribution system.

¶ 166. To achieve this objective, each year every employer is required to make contributions sufficient to fund the net costs of the current discounted value of future retirement benefits likely to be paid for employ-

employer shall resume making all required employer contributions.

[197] Currently, contribution rates for the payment of unfunded prior service liability are amortized over 40 years and the unfunded prior service liability balance may not be adjusted to reflect any change in the actuarial assumptions that are used to evaluate the liabilities of the WRS. Stipulation of Facts at ¶¶ 32–34. Consequently, the unfunded prior service liability balance may exceed or be less than the amount that is actuarially required to fund the prior service incurred by employers under the WRS. *Id.* at ¶ 32.

ees' service rendered in the current year.[198] Each employer also is required to make steady contributions to erase any unfunded liability that the employer has for employees' prior service.[199]

¶ 167. These employer required contributions are credited to the employer reserve.[200] Benefit adjustment contributions are treated as employer contributions, and they too are credited to the employer reserve, even though they are classified as employee contributions. In addition, Wis. Stat. § 40.04(5) provides that the employer reserve shall be:

> (b) Credited, as of each December 31, all fixed annuity division interest not credited to other accounts and reserves under this section.
>
> . . .
>
> (d) Credited as of the date of termination of any annuity under s. 40.26 or 40.63 (9) (c) with the excess of the then present value of the terminated annuity over the aggregate amount of credits reestablished in the accounts of the participant.
> (e) Credited all amounts waived, released or forfeited under any provision of this chapter.

¶ 168. The other source of funds for the employer reserve is earnings. Some of the money in the employer reserve is invested. The gains and losses from these investments are reflected in the TAA.

¶ 169. When earnings in the TAA are distributed to the various reserves and accounts in the fixed trust, the amount distributed to each account is a close approximation of the earnings derived from that

---

[198] Wis. Stat. § 40.05(2)(a); *Wisconsin Retirement System, supra,* at 38.

[199] Wis. Stat. § 40.05(2)(b) and (bm).

[200] Wis. Stat. § 40.04(5)(a).

account. There may not be a perfect correlation between the distribution of earnings in the TAA and the original source of investment funds because of the dynamic, ever-changing nature of each reserve; but the correlation is close. For the most part, the employer reserve is not receiving earnings on money derived from other accounts.

¶ 170. To summarize, most of the non-earnings dollars going into the employer reserve come directly from employers; and most of the earnings distributed to the employer reserve are earnings on employer reserve funds. To the extent that *any* non-employer money ends up in the employer reserve, it is directed there by longstanding provisions of Chapter 40, to help underwrite the ultimate payment of benefits, without impairing the property interests of any participant.

¶ 171. Some of the money in the employer reserve is not invested. It is held so that it can be paid over to the annuity reserve when active participating employees retire or when inactive employees become eligible to receive a benefit. Whenever an active participating employee retires or an inactive employee becomes eligible to receive a benefit, the provisions of Chapter 40, dictate exactly how much money is transferred out of the employer reserve.[201]

¶ 172. The balance in the employer reserve is not relevant to a participant's accrued retirement benefit. The size of the employer reserve balance does not increase or in any way determine the contractual benefit to be received by participants.[202] At best, the balance in the employer reserve may heighten the possibility of an increase in the formula multiplier or the benefit caps in a future vote by the state legislature.

---

[201] Wis. Stat. § 40.04(6).

[202] Respondent WEAC's brief at 54.

¶ 173. Respondents postulate that the employer reserve functions as a "sum sufficient" to fund accrued benefits.[203] WEAC observes that the employer reserve "is tapped to pay whatever amount is necessary, in addition to the individual account balance, to fund the annuity."[204] We agree.

¶ 174. The estimated unfunded liability in the employer reserve on December 31, 1998, was $2.2 billion.[205] Even if employers were to completely pay off every penny of this liability, they would still be responsible for future unfunded liability resulting from (1) future benefit increases voted by the legislature, (2) new recognitions of past service, and (3) actuarially-based recalculations of liability by the ETF Board.[206] Even if employers were to pay off every penny of this liability, they would not be assuring increased employee benefits.

¶ 175. No one in this litigation suggests that Act 11 abrogates the statutory and constitutional obligation of employers to fulfill benefit commitments to participants. These "benefits accrued" for "service rendered" are the essence of the property right enjoyed by participants. There is no taking of property or impairment of contract when everyone concedes that accrued benefits must be paid.

¶ 176. Nothing in Act 11 permits employers to back away from their obligation to pay accrued benefits. What SEA and WPPA claim instead is that participants in the WRS have a property right in the employer reserve and a contract right in a particular

---

[203] Respondents Lightbourn and Voight's brief at 42, 45, 55; Respondent WEAC's brief at 54.

[204] Respondent WEAC's brief at 54.

[205] Stipulation of Facts at ¶¶ 32, 58.

[206] See 1999 Wis. Act 11, § 27; Stipulation of Facts at ¶ 33.

regimen of employer funding that entitles them to block legislation that affects the amount of employee required contributions, or timing of employer required contributions, even though they do not allege that Act 11 threatens the security of the trust fund. Alternatively, petitioners claim that it is unconstitutional for the legislature to provide 1,200 government employers (and the taxpayers who support them) respite from employer required contributions—even though the money is not needed now, may not be needed in the future, and absolutely will have to be paid if ever it is needed—because, they claim, contribution relief for employers is a non-trust purpose.

¶ 177. In making these arguments, WPPA and SEA shift the discussion from the fulfillment of accrued benefits—the participant property interest—to the relative security of accrued benefits. They also claim a right to maximize the chance for additional benefits in the future.

¶ 178. SEA reasons that the trust fund "is more secure with cash reserves than it is when such reserves are replaced with a promise of repayment."[207] This may be true. The fact is, however, Chapter 40, explicitly recognizes "unfunded prior service liability." Wis. Stat. § 40.05(2)(b). It authorizes the gradual liquidation of that liability over a 40-year period. *Id.* It allows advance payment of the liability, permitting employers to avoid annual interest on their debt, Wis. Stat. § 40.05(2)(b) and (bg), but it does not require advance payment. Chapter 40 creates absolute liability for accrued benefits. It does not demand absolute security for that liability. There is no property right in absolute security because that would require cash in advance.

---

[207] Petitioner SEA's brief at 37.

¶ 179. Chapter 40 does not give active participating employees a property right to determine exactly how employers fulfill their benefit commitments. It gives them a property right in having their benefit commitments fulfilled. Participants do not have a legal right to veto legislative decisions about benefit funding without showing some tangible injury. In this, petitioners have failed.

¶ 180. Petitioners argue that there could be a shortfall in the employer reserve at some point in the future. Such a shortfall is more likely, they say, because $200 million will not be contributed to the reserve as a result of the contribution credits. They note that if a shortfall were to occur and it required an increase in contribution rates, the rate increase would be apportioned equally between employer required contributions and benefit adjustment contributions ostensibly paid by employees. Even if employers were to pick up all employee contributions associated with such a rate increase, they argue, the additional employer burden would leave less money for employee wage increases.

¶ 181. The court is not faced with these facts. We note that a temporary respite in employer contributions may make additional money available in the short term for employee wage increases. For some employees, such increases could affect "final average earnings." Should employees as a class ever have to make contributions to the employer reserve, they may renew the argument that the balance in the fund would have been greater if there had been no employer credits.

¶ 182. Finally, petitioners argue that they are entitled to all money in the employer reserve. WPPA

asserts that when the legislature authorized the $200 million in employer credits, it took money "owned by the participants and put [it] into the pockets of employers."[208] "[T]he $200,000,000 transfer from the TAA is tantamount to theft."[209] "After Act 11's compelled gift [to employers], $200,000,000 is gone from the Trust Fund. It is no longer available to beneficiaries of the trust."[210] "There is no legitimate trust purpose being served by the employer credit account."[211]

¶ 183. In fact, no money is removed from the employer reserve. The $200 million credit reduces the amount of unfunded liability in the employer reserve without requiring employers to make equivalent cash contributions, but this is different from removing money from the reserve for a non-trust purpose. Money cannot be removed from the employer reserve for a non-trust purpose.

¶ 184. Every distribution from the TAA to the employer reserve has the potential to affect employer required contribution rates. When the balance in the employer reserve is large, the chances are good that the ETF Board will respond by reducing employer required contributions under Wis. Stat. § 40.05(2)(a). In the past, because of good investment performance and other factors, the ETF Board has reduced employer required contributions on several occasions. These rate adjustments have influenced the balance in the employer reserve.

¶ 185. The $200 million employer credit is a new departure because it will reduce employer required contributions under § 40.05(2)(b) instead of

---

[208] Petitioner WPPA's brief at 15.
[209] Petitioner WPPA's brief at 16.
[210] Petitioner WPPA's brief at 24.
[211] Petitioner SEA's brief at 28.

§ 40.05(2)(a), although it will reduce contributions under § 40.05(2)(a) for employers who have no unfunded liability.

¶ 186. We see no legal reason why slowing the stream of funds into the employer reserve under § 40.05(2)(a) does not violate the participants' property interests but temporarily suspending the flow of funds into the employer reserve under § 40.05(2)(b) does. The former action assists employers with liabilities for current service while the latter action assists employers with liabilities for past service. Neither action relieves employers of their absolute obligation to fulfill all benefit commitments as they come due. Both actions hold down costs. The legitimacy of this objective is specifically acknowledged in Wis. Stat. § 40.01(2) ("fulfillment at the lowest possible cost"). This objective is reaffirmed in Wis. Stat. § 40.04(5)(e), which credits the employer reserve with "all amounts waived, released or forfeited under any provision of this chapter" to help employers fulfill benefit commitments.

¶ 187. In maintaining that employees are entitled to all money in the employer reserve, WPPA and SEA are really claiming a contractual right to benefit increases that might be, but have not yet been, approved. They reason that the greater the balance in the employer reserve, the more likely it is that the legislature will vote to increase retirement benefits, inasmuch as the legislature will be able to fund most or all of the increases out of the earnings of the fixed trust.

¶ 188. This court cannot invalidate a legislative act on grounds that it may reduce the possibilities for an increase in retirement benefits sometime in the future. Our responsibility is to uphold legislation whenever we reasonably can. These speculative claims

do not provide a basis for finding Act 11 unconstitutional beyond a reasonable doubt.

1. Taking of Property

¶ 189. Both WPPA and SEA view the $200 million credit as a taking. This requires us to determine, first, whether a property interest exists, and, second, whether the property has been taken.

¶ 190. Non-annuitant participants in the WRS have a general property interest in the employer reserve because it is one of the funding sources for their future benefits. Once contributions enter the employer reserve, they no longer belong to employers and may not be reclaimed by employers. They are assigned to participants. Non-annuitant participants have the right to block improper diversions from the employer reserve and to protect the integrity and security of the employer reserve so that benefit commitments will be fulfilled. Non-annuitants have an individual property interest to the full extent of their benefit commitments.

¶ 191. Conversely, participants do not have a right to require a balance in the employer reserve that is greater than an amount prudently necessary to fulfill statutorily-determined benefit commitments over an actuarially-determined period of time. The ETF Board has long had the authority to set contribution rates to achieve this objective. Wis. Stat. § 40.03(1)(e). The legislature buttresses this authority in Act 11: "the employee trust funds board shall retain authority to maintain proper actuarial funding of the Wisconsin retirement system." 1999 Wis. Act 11, § 27(3). This affirmation of the ETF Board's authority represents a fail-safe for the WRS that overrides all other provisions of Act 11.

¶ 192. While the $200 million employer credit is likely to affect the balance in the employer reserve, we see no evidence that the credit here will damage the property interests of non-annuitant participants. It does not "take" their property. All money in the employer reserve remains in the reserve and will go toward funding future benefits. No non-annuitant participant will receive less from the employer reserve than Chapter 40, requires. Speculation about how benefits might be increased in the future does not outweigh the legislature's right to amend the provisions of Chapter 40, to reduce employer costs on a temporary basis, provided the WRS remains secure.

2. Impairment of Contract

¶ 193. WPPA and SEA also contend that the $200 million credit constitutes an impairment of contract. This claim fails because petitioners cannot show an impairment of the contractual relationship. *Chappy*, 136 Wis. 2d at 187.

¶ 194. WPPA suggests that the employer credit here is analogous to the transfer of funds from one retirement fund to another. The credit, it argues, "permanently reduces the dollars available to participants from the Fund."[212] It quotes *Association of State Prosecutors* to the effect that: "Any pension plan's ability to meet its obligations can be jeopardized when funds are taken from it, since every dime is arguably part of a management strategy dependent upon spreading the fund's monies as broadly as possible. . . ."[213]

---

[212] Petitioner WPPA's brief at 28.

[213] Petitioner WPPA's brief at 29 (quoting *Ass'n of State Prosecutors*, 199 Wis. 2d at 560).

¶ 195. That argument overlooks the distinction between taking money out of a fund held in trust for participants, and suspending payment of money into a fund before the employers' property interest has transferred. Moreover, in *Association of State Prosecutors*, the money leaving the Milwaukee County fund was *never* going to be replaced by the WRS. Here the money not sent into the employer reserve *must* be replaced if it is ever needed.

¶ 196. Petitioners' contract claim also skirts the fact that Chapter 40, preserves the state's right "to amend or repeal, by enactment of statutory changes, all or any part of this chapter at any time. . .and there shall be no right to further accrual of benefits nor to future exercise of rights for service rendered after the effective date of any amendment or repeal." Wis. Stat. § 40.19(1). This language is just as much a part of the contract as any other provision in Chapter 40. When the legislature acts to amend the chapter to hold down employer costs, it is acting in conformity with Wis. Stat. § 40.01(2), so long as it is not attempting to abrogate benefit commitments or compromise the security of the fund.

¶ 197. SEA admits that the provisions of Act 11, in and of themselves, do not leave the trust fund in a financially troubled condition. It suggests instead that Act 11 poses a "systematic threat to the Trust Fund" that will serve as a dangerous precedent "for future legislative conversions that could threaten the solvency and actuarial soundness of the Trust Fund."[214]

¶ 198. During oral argument, the court explored the question whether the legislature could recognize sufficient money from the TAA to wipe out all

---

[214] Petitioner SEA's brief at 42.

unfunded liability in the employer reserve. This hypothetical would present a very different set of facts and circumstances from the present case. We think the checks and balances within the legislative process, bolstered by the requirements of Article IV, Section 26, and Joint Rule 12, make it unlikely such a scenario will develop. Moreover, the ETF Board would stand as a bulwark of fiduciary responsibility to protect the security of the fund. Critics of such a move would focus on the cumulative effect of liability reductions in relation to other legitimate objectives of the employer reserve and suggest an impermissible loss of balance. In any event, the specter of an extreme situation is no substitute for the facts at hand.

¶ 199. We conclude that the $200 million employer contribution credit is not an unconstitutional taking or an impairment of contract. It does not conflict with Wis. Stat. § 40.19(1) or trust principles. The $200 million credit is not unconstitutional beyond a reasonable doubt.

E. Amendments Changing the Assumed Rate and the Across-the-Board Salary Increase Rate

¶ 200. *WPPA and SEA contend that the legislative modifications to the statutory assumed rate and the statutory across-the-board salary increase rate usurp the ETF Board's authority, thereby impairing their contract rights under Wis. Stat. § 40.19(1), and that the rate changes are otherwise unconstitutional.*

¶ 201. Employer required contribution rates are not set by statute. They are set by the ETF Board upon recommendation of the actuary as part of an annual

actuarial evaluation of the WRS.[215] Each year the WRS consulting actuary evaluates the funding requirements of the system, then makes recommendations of the contributions necessary to pay the costs of future retirement benefits.[216]

¶ 202. . As noted above, the actuary incorporates two key actuarial assumptions into the recommendations for employer required contributions. One is the "assumed rate," defined as "the probable average effective rate expected to be earned for the fixed annuity division on a long-term basis." Wis. Stat. § 40.02(7). Another is the across-the-board salary increase rate. *Id.*

¶ 203. Prior to Act 11, Wis. Stat. § 40.02(7) read as follows:

> "Assumed rate" means the probable average effective rate expected to be earned for the fixed annuity division on a long-term basis. The assumed rate shall be a rate of 7.5% and the actuarial assumption for across-the-board salary increases for the purpose of valuing the liabilities of the Wisconsin retirement system shall be 1.9% less than the assumed rate unless due to changed economic circumstances the actuary recommends and the board approves a different rate. The assumed rate for a calendar year shall be used for all calculations of required contributions and reserves for participants, except as provided in s. 40.04(4)(a)2. and 2m., and the amount of any lump sum benefit paid instead of an annuity, except it shall not be used for any purpose for which the assumed benefit rate is to be used under sub. (6).

---

[215] Stipulation of Facts at ¶ 28.
[216] Stipulation of Facts at ¶ 28.

¶ 204. Act 11 amended Wis. Stat. § 40.02(7), changing the assumed rate in the statute from 7.5 percent to 8 percent.[217] It also changed the across-the-board salary increase rate from 1.9 percent less than the statutory assumed rate to 3.4 percent less than the statutory assumed rate.[218]

¶ 205. The impact of these statutory changes is somewhat illusory. The ETF Board exercised its authority to revise the assumed rate twice, including 1992 (when it set the rate at 8 percent for 1993). The Board exercised its authority to revise the across-the-board salary increase rate in 1988, 1994, and 1997 (when the rate was set at 4.8 percent, that is, 8 percent less 3.2 percent). Hence, the real effect of Act 11 is to change the across-the-board salary increase rate from 4.8 percent to 4.6 percent.

¶ 206. Act 11 maintains the authority of the Board to alter the actuarial rates "due to changed economic circumstances" when the actuary recommends different rates. Wis. Stat. § 40.02(7); 1999 Wis. Act 11, § 4. It also vests the ETF Board with clear "authority to maintain proper actuarial funding of the Wisconsin retirement system." 1999 Wis. Act 11, § 27(3).

¶ 207. WPPA and SEA challenge the legality of the changed statutory assumptions. They argue that the changes usurp the exclusive authority of the ETF Board to set these two actuarial rates. According to WPPA, "the legislature unilaterally imposes a new 'assumed rate' on WRS participants. This interferes with the statutory and fiduciary responsibility of the

---

[217] 1999 Wis. Act 11, § 4.

[218] 1999 Wis. Act 11, § 4.

DETF and the Board."[219] The rate changes, SEA declares, "were not recommended by the actuary, were not based on changed economic circumstances, and were not approved by the ETF Board."[220]

¶ 208. This argument would be compelling if the legislature had stripped the ETF Board of its broad discretion to change the rates, irrespective of the statute. It did just the opposite. Hence, the ETF Board may change actuarial rates in response to changed economic conditions upon recommendation of the actuary, or if necessary to maintain proper actuarial funding of the system.

¶ 209. The changes in the assumed rate and the across-the-board salary increase rate do not violate Wis. Stat. § 40.19(1). WPPA insists that "one of the contract rights of the participants in the WRS is that it be insulated from politics, and that the Board acting as fiduciary, not the legislature acting like politicians, be in charge of the day-to-day decision-making."[221]

¶ 210. WPPA ignores the fact that benefit increases must be approved by the legislature, acting in a policy-making capacity. Wisconsin Stat. § 40.19(1) gives that same legislature the right to change the terms of the WRS contract, so long as modifications do not abrogate benefits accrued to participants for service rendered.

¶ 211. In the past, the ETF Board has repeatedly adjusted employer required contributions and unfunded liability after making adjustments in the assumed rate and the across-the-board salary increase

---

[219] Petitioner WPPA's brief at 30–31. The assumed rate is also the rate of interest on unfunded liability. Wis. Stat. § 40.05(2)(b).

[220] Petitioner SEA's brief at 44.

[221] Petitioner WPPA's brief at 36.

rate. We do not understand why the legislature may not also make adjustments in statutory rates, provided the ETF Board has the final word so that the WRS is always protected.

¶ 212. No point would be served by further analysis of the contention that the changes to the actuarial assumptions are a taking of property and an impairment of contract, as these contentions have already been discussed twice. The same reasoning applied in our constitutional discussion of the $4 billion transfer and the $200 million credit applies here. Nothing the legislature has done relieves employers of their absolute liability to fulfill the benefit commitments contemplated in Wis. Stat. § 40.19(1). These accrued benefits are the essence of the participants' property interest. There is no taking of that interest. Participants do not have a property interest in a particular actuarial assumption set in the statute. They have an interest in the integrity and security of the trust fund, and this legislation does not put that in jeopardy.

F. Benefit Caps

¶ 213. *WPPA contends that raising the 65 percent benefit cap by 5 percent for all employees except protective occupation employees violates the equal protection clause of the United States Constitution and Article I, Section 1 of the Wisconsin Constitution.*

¶ 214. Active participating employees who retire when they are entitled to receive a benefit and inactive participating employees who become eligible to receive a benefit may choose between a "normal form annuity" (the formula benefit) or the money purchase annuity provided in Wis. Stat. § 40.23(3). The money purchase annuity is based upon "the sum of the participant's

accumulated additional and required contributions plus an amount from the employer accumulation reserve equal to the participant's accumulated required contributions." Wis. Stat. § 40.23(3).

¶ 215. A normal form annuity or formula benefit is capped. A money purchase annuity is not.

¶ 216. Prior to Act 11, the *maximum* amount of the initial annuity for a participant in the WRS (including a protective occupation participant with social security) who receives a formula benefit, was an amount equal to 65 percent of the participant's final average earnings. Wis. Stat. § 40.23(2m)(b). The notable exception to the 65 percent cap was for protectives without social security whose formula benefit was capped at 85 percent of final average earnings.

¶ 217. Act 11 raises the benefit cap for all active participating employees who are capped at 65 percent *except* protectives with social security. The formula benefit for these protectives remains capped at 65 percent, while the formula benefit for the remaining protectives remains capped at 85 percent.

¶ 218. WPPA contends that the failure to raise the benefit cap for the "65 percent" protective occupation participants denies them equal protection of the law, in violation of the federal and state constitutions.[222] We are not persuaded.

---

[222] The Fourteenth Amendment to the United States Constitution reads, in part:

No State shall make or enforce any law which shall. . .deny to any person within its jurisdiction the equal protection of the laws.

Article I, Section 1 of the Wisconsin Constitution provides:

All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

¶ 219. WPPA asserts that there is no rationale in the legislative history of Act 11 explaining why the Act increased the cap for general, executive, and elective participants to 70 percent of final average earnings but maintained the 65 percent cap for law enforcement participants.[223] "There is no rational basis for denying protective occupation participants with social security the increase in the cap," WPPA declares.[224]

¶ 220. The practical effect of the law is that protectives with social security are capped with a formula benefit when they have 32.5 years or more of creditable service. The law caps the formula benefit of the other protectives when they have 34 years or more of creditable service.[225] There are currently 12 protectives with social security and 29 protectives without social security who have at least 32.5 years and 34 years of creditable service, respectively, who will not be eligible to receive an increase in their formula-based annuity when Act 11 is implemented.[226] However, according to DETF, because the trust fund's assets have enjoyed good investment performance in recent years, each of the 41 protectives, "if they retired in the foreseeable future, will receive a money purchase annuity, rather than a formula-based annuity. The benefits of a money purchase-based annuity are not subject to the maximum annuity limitations."[227]

■

¶ 221. When a party seeks to challenge the constitutionality of a statute on equal protection grounds, it must demonstrate that the statute treats members of

---

[223] Petitioner WPPA's brief at 53.

[224] Petitioner WPPA's brief at 54.

[225] Stipulation of Facts at ¶ 62.

[226] Stipulation of Facts at ¶ 64.

[227] Stipulation of Facts at ¶ 64.

a similarly situated class differently. *Tomczak v. Bailey*, 218 Wis. 2d 245, 261, 578 N.W.2d 166 (1998) (citing *State v. Post*, 197 Wis. 2d 279, 318, 541 N.W.2d 115 (1995)). Usually, this court will uphold a statute under an equal protection challenge if we find that a rational basis supports the legislative classification. *Aicher v. Wis. Patients Comp. Fund*, 2000 WI 98, ¶ 56, 237 Wis. 2d 99, 613 N.W.2d 849. A statute not subject to strict scrutiny analysis, as is conceded by WPPA here, enjoys a strong presumption of constitutionality; and we employ a rational basis test to examine Act 11's constitutionality.

¶ 222. Under a rational basis test, a statute is unconstitutional if the legislature applied an irrational or arbitrary classification when it enacted the statute. *Omernik v. State*, 64 Wis. 2d 6, 18–19, 218 N.W.2d 734 (1974). But the court must sustain a statute using this analysis unless we find that it is patently arbitrary and bears no relationship to a legitimate government interest. *Tomczak*, 218 Wis. 2d at 264. As we said in *Aicher*: "Recognizing that classifications often are imperfect and can produce inequities, our goal is to determine whether a classification scheme rationally advances a legislative objective. . . .In so doing, we are obligated to locate or. . .construct a rationale that might have influenced the legislative determination." *Aicher*, 237 Wis. 2d at ¶ 57.

¶ 223. A legislative classification satisfies the rational basis test if it meets five criteria:

(1) All classification[s] must be based upon substantial distinctions which make one class really different from another.

(2) The classification adopted must be germane to the purpose of the law.

(3) The classification must not be based upon existing circumstances only. [. . .It must not be so constituted as to preclude addition to the numbers included within a class.]

(4) To whatever class a law may apply, it must apply equally to each member thereof.

(5) That the characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.

*Tomczak*, 218 Wis. 2d at 272–73 (quoting *Dane County v. McManus*, 55 Wis. 2d 413, 423, 198 N.W.2d 667 (1972)). Act 11 meets these criteria.

¶ 224. The legislature has differentiated between protective occupation participants and other WRS participants in several respects. Traditionally, protectives have been given higher formula multipliers than most other WRS participants, especially the protectives without social security. The normal retirement age of protectives is 54, or 53 with 25 years of service, whereas the normal retirement age of general employees is 65, or 57 with 30 years of service.[228] The minimum retirement age (for early retirement with reduced benefits) is 50 for protectives, but 55 for all other categories.[229]

¶ 225. Because of the costs associated with these benefits, the total contribution rates for protectives are higher than for other categories of employees—16.6

---

[228] Wis. Stat. § 40.02(42); Stipulation of Facts at ¶ 47.
[229] Wis. Stat. § 40.23(1)(a); Stipulation of Facts at ¶ 48.

percent for protectives with social security, 23.4 percent for protectives without social security.[230]

¶ 226. Plainly, protectives are among the most expensive employees to maintain. Thus, there are not only policy reasons (related to the demanding nature of the work) but also economic reasons (related to cost) for the legislature to encourage protective occupation participants to retire at the normal retirement age. Protectives with social security will not become capped under the law until 7.5 years *after* the normal retirement age if they have 25 years of service. Protectives without social security will not become capped under the law until 9 years after the normal retirement age if they have 25 years of service.

¶ 227. We believe this analysis provides a rational basis for the classifications drawn by the legislature. The classifications are long standing and germane to the law. Moreover, the legislature did not discriminate against protectives when it increased the formula multiplier. It increased the multiplier for past service for all protectives who were active participating employees on January 1, 2000. Because of the money purchase annuity, WPPA is unable to point to a single protective that will be hurt by continuation of the benefit caps if the protective retires at any time in the foreseeable future. WPPA has provided no credible basis to invalidate the law on equal protection grounds. They have failed to show that this component of the statute is unconstitutional beyond a reasonable doubt.

---

[230] Stipulation of Facts at ¶ 49.

## G. Sufficient State Funds

¶ 228. *SEA contends that Act 11 is unconstitutional because it fails to provide sufficient state funds to cover the cost of increased benefits as required by Article IV, Section 26 of the Wisconsin Constitution.*[231]

¶ 229. SEA observes that the benefit improvements in Act 11 are funded, at least in part, with assets of the trust fund. Assets of the trust fund, it argues, cannot be considered "state funds." Therefore, the Act does not comply with the constitution.

¶ 230. Earlier in this opinion, we carefully avoided a determination whether Article IV, Section 26 applies to Act 11. We held instead that if the three-fourths vote provision of Section 26 did apply, the Act had been passed by "a three-fourths vote of all the members elected to both houses of the legislature."

¶ 231. One effect of the 1974 constitutional amendment is to authorize "increased benefits for persons who have been or shall be granted benefits of any kind under a retirement system." The two prerequisites for increased benefits using the authority *under the amendment*, are (1) "a three-fourths vote" and (2) "sufficient state funds to cover the costs of the increased benefits."

¶ 232. Act 11 does not appropriate tax dollars to cover the costs of increased benefits for either state or local employees. Consequently, if we were to determine that Article IV, Section 26 applies to Act 11, we might have to invalidate all benefit enhancements in the Act, or, in the alternative, hold that monies in the trust fund are "state funds." On the other hand, if we were to hold that the provisions of Article IV, Section 26 do not apply to Act 11—an act with multiple benefit enhance-

---

[231] Petitioner SEA's brief at 47.

ments for both past and present employees—we would be holding that Assembly Bill 495 could have been passed by a simple majority vote in each house of the legislature. The latter holding would establish an important precedent for future pension enhancement legislation.

¶ 233. There may be ways to interpret the constitutional language to avoid these stark and difficult choices. In this case, however,

SEA has failed to argue its point with sufficient clarity or conviction that we feel bound to address the question. One and one-half pages of indifferent argument are inadequate to inform the court on an issue of this magnitude. As we noted recently in *Wisconsin Conference Board of Trustees of the United Methodist Church v. Culver*, 2001 WI 55, ¶ 38, 243 Wis. 2d 394, 627 N.W.2d 469 (quoting *Cemetery Services, Inc. v. Department of Regulation & Licensing*, 221 Wis. 2d 817, 831, 586 N.W.2d 191 (Ct. App. 1998)): "[W]e generally choose not to decide issues that are not adequately developed by the parties in their briefs."

¶ 234. We respectfully suggest that the legislature examine the implications of the "state funds" language in Article IV, Section 26, which was adopted as a floor amendment to 1971 Senate Joint Resolution 3 on February 11, 1971. This legislative action predated by several years the creation of the TAA and it may not have contemplated the dynamic evolution of the WRS.

## V. CONCLUSION

¶ 235. To sum up, this court concludes that Act 11 is constitutional, having been approved by the requisite number of votes, namely, "a three-fourths vote of

all the members elected to both houses of the legislature." The Act does not take the petitioners' property without just compensation, nor does it impair the obligations of their contract with the State of Wisconsin. It does not violate the fundamental principles of Chapter 40, or any right preserved in Wis. Stat. § 40.19(1). It does not violate trust principles. Rather, it strengthens the hand of the ETF Board. Consequently, the relief requested by petitioners is denied and the injunction issued by this court is lifted.

*By the Court.*—Rights declared and declaratory relief denied.

¶ 236. WILLIAM A. BABLITCH, J. *(concurring in part, dissenting in part).* I join the majority opinion with the exception of part IV.D. regarding the $200,000,000 credit given to employers. This credit is a forgiveness of a debt owed by employers to the Wisconsin retirement system (WRS). It is not the state's to forgive. The state is not the owner of this debt; the employees are. Accordingly, I respectfully dissent to this part of the majority opinion. My reasoning follows.

¶ 237. The thrust of my dissent can be easily illustrated by a hypothetical. "A" owes "B" $200. "C" tells "A," "Don't pay 'B.' I forgive that debt." "B" then says, "Hey, that debt belongs to me. You can't forgive it." "C" then replies, "I just have." "A" is, of course, all of the employers in the Wisconsin Retirement System. "B" is all of the employees. "C" is the legislature. That, in effect, is precisely what happened in this part of the legislation.

¶ 238. Prior to the legislation, state and municipal employers either owed or will owe $200,000,000 into the WRS. This legislation forgives this past and

future debt. Accordingly, the WRS will have $200,000,000 fewer assets available to it when future employee benefits or contributions are considered.

¶ 239. This $200,000,000 of debt, past or future, is not the legislature's money to use to balance their budget, relieve property taxes, or the like. This money belongs to the employees.

¶ 240. Is this an unconstitutional taking? Of course.

¶ 241. In a takings analysis, we must first determine whether the affected parties have a property interest. *Wis. Retired Teachers Ass'n v. Employe Trust Funds Bd.*, 207 Wis. 2d 1, 18, 558 N.W.2d 83 (1997). In this case, the employees unquestionably have a property interest in this debt. The debt is to the system. This money is not largesse from the employers; it is their obligation to pay.

¶ 242. We have consistently held that employees have a property interest in their retirement system. *See Association of State Prosecutors v. Milwaukee County*, 199 Wis. 2d 549, 558, 563, 544 N.W.2d 888 (1996); *State Teachers' Ret. Bd. v. Giessel*, 12 Wis. 2d 5, 9–10, 106 N.W.2d 301 (1960). Here, the debt (present and future) is in essence an asset of that system which the employees are the beneficiaries.

¶ 243. Once we determine that a property interest exists, the next step is to examine whether this interest has been taken. *Wis. Retired Teachers Ass'n*, 207 Wis. 2d at 20. Again, it seems clear beyond a reasonable doubt that an asset of the system, the present and future debt of the employers to the system, has been taken because the obligation has been relieved. There is now $200,000,000 less in the system than there would have been. That seems to be a taking under anybody's definition.

¶ 244. This is woefully bad precedent. To allow the legislature to take assets from the retirement system which belongs to the employees and use it for a purpose other than the employees without so much as a "by your leave," which is of course what happened here, potentially opens the floodgates to great mischief. We have previously warned of the dangerousness of such precedent. *Association of State Prosecutors*, 199 Wis. 2d at 562.

¶ 245. What if the legislature needs to plug a $25,000,000 hole in the state budget? What is to stop the legislature from "forgiving" the state $25,000,000 in future payments into the employer reserve account?

¶ 246. What if the counties, in their demand for property tax relief, are willing to cut a deal with the legislature for forgiveness of whatever amount, both past and future debt, in lieu of state aids?

¶ 247. No amount of words can paper over the end result here. The employers are $200,000,000 richer because they no longer have a $200,000,000 obligation; the employees are $200,000,000 poorer because they no longer have available to them, either now or in the future, that money for potential benefits. I respectfully dissent.

¶ 248. I would sever that portion of the legislation regarding the $200,000,000 credit and leave the rest of the legislation intact.

¶ 249. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. It is the province of this court to decide the constitutionality of legislation, not the wis-

dom of the legislature. I conclude that Act 11 is an unconstitutional intrusion on the state pension fund.[1]

¶ 250. The challenge to Act 11 is multifaceted. Unlike the majority opinion, a dissent need not resolve the constitutionality of each provision. I shall touch upon only two of the challenges, but my silence about the others should not be interpreted as agreement with the majority opinion about them.

¶ 251. First, the majority opinion upholds the $200 million contribution credit given employers, which the legislative drafting file baldly refers to as a "contribution holiday" for employers. The monies held in the Employe Trust Fund (ETF) have been irrevocably placed in trust for the benefit of the retirement system participants, and the State cannot direct that such monies be used for non-ETF purposes. The $200 million employer contribution credit, as Justice Bablitch also explains, is a diversion of $200 million of ETF monies in which retirement system participants have a protected property and contract right.

¶ 252. This diversion is an unlawful taking and an impairment of contract, as well as a violation of

---

[1] This original action to declare Act 11 unconstitutional was initiated by the Employe Trust Fund Board and Eric O. Stanchfield, Secretary of the Employe Trust Fund. This court denied the Board's and the Secretary's petition for leave to commence the action on the ground that they lack standing to challenge the constitutionality of the legislation. *See* Supreme Court Order filed February 10, 2000; *see also Fulton Found. v. Dep't. of Taxation,* 13 Wis. 2d 1, 11, 108 N.W.2d 312 (1961); *Columbia County v. Bd. of Trustees of the Wis. Ret. Fund,* 17 Wis. 2d 310, 316–17, 116 N.W.2d 142 (1962); *State v. City of Oak Creek,* 2000 WI 9, 232 Wis. 2d 612, 605 N.W.2d 526. While I dissented in *City of Oak Creek* and continue to disagree with the decision, I am bound by it and therefore concurred in the order dismissing these parties. ,

trust principles. The Wisconsin and federal constitutions do not allow the legislature to balance the state budget or shift resources among governmental entities by using assets belonging to the ETF. Promises to contribute to the fund are assets belonging to the ETF. As a result of the majority opinion, Wisconsin now unfortunately joins other states that have viewed their once-burgeoning pension funds as sources of budget relief.[2]

¶ 253. Second, although Act 11 has multiple benefit enhancements for both past and present employees, the majority opinion carefully avoids determining a constitutional "issue of magnitude":[3] Does Act 11 violate the extra compensation clause of Article IV, Section 26 of the Wisconsin Constitution?[4]

¶ 254. The majority opinion explains its dilemma in addressing this constitutional question: If Article IV,

---

[2] See Ridgeley A. Scott, A Skunk at a Garden Party: Remedies for Participants in State and Local Pension Plans, 75 Denv. U. L. Rev. 507, 507 (1998) ("Legislators who want to spend more money than is available prefer to obtain the difference by a method other than raising taxes. Pension trusts for public employees are especially inviting because they frequently have substantial assets.") (citations omitted).

[3] See majority op. at ¶ 233.

[4] Article IV, Section 26, provides:

(1) The legislature may not grant any extra compensation to a public officer, agent, servant or contractor after the services have been rendered or the contract has been entered into.

. . .

(3) Subsection (1) shall not apply to increased benefits for persons who have been or shall be granted benefits of any kind under a retirement system when such increased benefits are provided by a legislative act passed on a call of ayes and noes by a three-fourths vote of all the members elected to both houses of the legislature and such act provides for sufficient state funds to cover the costs of the increased benefits.

Section 26 does not apply to Act 11, the majority opinion would be holding that a simple majority vote, not a three-fourths vote, is needed to adopt a law such as Act 11. The majority opinion does not want to establish the precedent that this Act does not grant extra compensation because it wants Section 26 to remain a viable check on the legislature.[5]

¶ 255. But if Section 26 does apply to Act 11,[6] then the majority opinion would have to hold that the monies in the ETF are "state funds" to satisfy Article IV, Section 26, because Act 11 uses assets of the ETF to fund part of the benefits. Act 11 does not appropriate any non-ETF monies to cover the costs of increased benefits. The majority opinion apparently does not want to establish the precedent that assets of the ETF are "state funds" either.[7]

¶ 256. To avoid this dilemma, the majority opinion explains that the State Engineering Association failed to argue this point with sufficient clarity or conviction to make the majority feel bound to address the question.[8] The State Engineering Association has requested that the court determine what "state funds"

---

[5] *See* majority op. at ¶¶ 88, 232. I am troubled by the majority opinion's assertion that Section 26 will serve as an adequate check on the legislature in the future. *See* majority op. at ¶ 198. In my view, the majority opinion has undermined the effectiveness of this check by declining to enforce it in this instance. The majority opinion also relies on Joint Rule 12 even though it concludes that the rule does not correctly interpret the constitution. *See* majority op. at ¶¶ 91–97.

[6] *See* majority op. at ¶ 87, indicating that Article IV, Section 26 applies to Act 11.

[7] *See* majority op. at ¶ 232.

[8] *See* majority op. at ¶ 233.

means in the Wisconsin Constitution, in the context of this case.[9] Its argument is sufficient.

¶ 257. Furthermore, the focus in the majority opinion on whether Act 11 provides state funds ignores the fact that the legislature has not provided *sufficient* state funds to finance these benefit improvements, as Article IV, Section 26 requires. With the $200 million credit to employers and the $4 billion transfer from the TAA, Act 11 funds only a portion of the cost of the increased benefits for prior service.[10]

¶ 258. I see no other conclusion than that the increased benefits for past service provided in Act 11 are unconstitutional.

¶ 259. As to the severability of unconstitutional portions of Act 11, I agree with the respondents (the defenders of the constitutionality of Act 11) that the funding and benefit provisions are not severable. In other words, if any funding provisions are unconstitutional, the benefit provisions relating thereto cannot stand.

¶ 260. Despite my disagreement with the majority opinion about the constitutionality of Act 11, I think the majority opinion sets forth important precedent that helps to limit the possibility of future intrusions on the state pension fund.

---

[9] It is problematic to suggest that the legislature revisit the meaning of "state funds" in Article IV, Section 26, unless the majority opinion is referring to a constitutional amendment. *See* majority op. at ¶ 234.

[10] For this fact, we need look no further than the subject line of the Legislative Reference Bureau's fiscal estimate form, which accompanied Assembly Bill 495. The subject line states that the act "make[s] several benefit improvements to the WRS and fund[s] them *partially* by recognizing $4 billion from the TAA." (Emphasis added.)

¶ 261. In particular, two facets of the majority opinion bear repeating. One, the majority upholds the statutory adjustment to actuarial assumptions only to the extent that the legislature does not interfere with the ETF Board's discretion.[11] In concluding that the ETF Board must always have the final word regarding actuarial assumptions, the majority implicitly sides with the petitioners on this issue. The petitioners expressed fear that Act 11 might pave the way for future changes to the actuarial assumptions that could interfere with the ETF Board's authority. The majority opinion does not allow for this possibility.

¶ 262. Two, the majority opinion leaves open the possibility that employees as a class may have a viable cause of action should they have to make contributions to the employee reserve as a result of the $200 million credit to employers. *See* majority op. at ¶¶ 180–81. The majority has simply concluded that under the facts of this case, the possibility of a future employee contribution increase is too speculative a basis for deeming Act 11 unconstitutional. However, were the legislature to authorize a larger employer credit, or were the legislature to authorize employer credits on a regular basis, this court might view the potential for employee contributions as more than mere speculation and as a viable basis for challenging the constitutionality of such future credits.

¶ 263. For the reasons set forth, I dissent.

¶ 264. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[11] *See* majority op. at ¶ 211.